# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 04/28/2020 11:51 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Wong,Deputy Clerk

1  Eugene Ashley (State Bar No. 171885)
2  EUGENE.ASHLEY@HOGEFENTON.COM
   HOGE, FENTON, JONES & APPEL, INC.
3  SIXTY SOUTH MARKET STREET, SUITE 1400
   SAN JOSE, CA 95113
4  TELEPHONE: 408.287.9501
   Facsimile: 408.287.2583
5

6  Michael Paris, Esq. (*pro hac vice* pending)
   William C. Nystrom, Esq. (*pro hac vice* pending)
7  Nina Hirsch, Esq. (*pro hac vice* pending)
   NYSTROM BECKMAN & PARIS LLP
8  One Marina Park Drive, 15th Floor
   Boston, Massachusetts 02210
9  Telephone: (617) 778-9100
   Facsimile: (617) 778-9110
10

11 *mailing address:*
   P.O. Box 1469
12 San Jose, CA 95109-1469
   Telephone:   (408) 286-9800
13 Facsimile:   (408) 998-4790

14 Attorneys for Plaintiffs

15

16           SUPERIOR COURT OF THE STATE OF CALIFORNIA

17               COUNTY OF LOS ANGELES

18 ALFRED JACKSON, MICHAEL          CASE NO. 20GDCV00419
   JACKSON, GRANGER
19 CONSTRUCTION COMPANY, WIENER     **COMPLAINT**
   ACQUISITION COMPANY, LLC,        **AND DEMAND FOR JURY TRIAL**
20 MILLICENT CALICCHIO, VALERIE
   SABET, MAXX VENTURE FUND H,
21 LLC, OGIE, LLC, THE STEVEN C.
   CALICCHIO FOUNDATION,
22 CHARITABLE LEAD ANNUITY TRUST
   "A" U/W OF STEVEN CALICCHIO,
23 CHARITABLE LEAD ANNUITY TRUST
   "B" U/W OF STEVEN CALICCHIO,
24 EXEMPT TRUST U/W OF STEVEN
   CALICCHIO FBO AXEL CALICCHIO,
25 EXEMPT TRUST U/W OF STEVEN
   CALICCHIO FBO ORIANA
26 CALICCHIO, AJC LEGACY
27
28

───────────────────────────────────────────

**COMPLAINT AND DEMAND FOR JURY TRIAL**

INVESTMENTS, LLC, OCC LEGACY
INVESTMENTS, LLC,

                Plaintiffs,

      v.

DELOITTE & TOUCHE LLP, a Delaware
limited liability partnership, and
DELOITTE TAX, LLP, a Delaware limited
liability partnership, and OPUS FUND
SERVICES (USA) LLC, a Delaware
limited liability company, and DOES 1
through 50,

                Defendants.

Plaintiffs hereby bring this Complaint against Defendants Deloitte & Touche LLP ("Deloitte"), Deloitte Tax, LLP ("Deloitte Tax"), and Opus Fund Services (USA) LLC ("Opus") (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1. This action asserts negligent and intentional misrepresentation claims against Defendants for failing to detect one of the larger financial frauds in recent history—the collapse of a $789 million private investment fund structure managed by Direct Lending Investments, LLC ("DLI"). For years, DLI boasted an impressive track record that the Defendants "independently" corroborated year after year. Those impressive returns, however, were based on inflated returns and fake financial reporting

2. Plaintiffs collectively invested over $19,480,000 in Direct Lending Income Fund, L.P. ("DLIF"), a DLI feeder fund formed by Brendan Ross ("Ross") to invest primarily in online lending marketplaces.[1] Both before and throughout their investments, Plaintiffs' registered

---

[1] When used herein, the term "Funds" refers to the private investment funds managed by DLI, discussed *infra*: DLIF, Direct Lending Income Feeder Fund, Ltd. ("DLIFF"), and DLI Capital, Inc. ("DLI Capital") and its subsidiaries, DLI Capital Partner, Inc.("DLI CP"), DLI Assets, LLC ("DLI Assets"), and DLI Assets Bravo, LLC ("DLI Bravo").

**COMPLAINT AND DEMAND FOR JURY TRIAL**

investment advisor (the "RIA") performed comprehensive due diligence to validate the Funds' purported years of unbroken returns.  It analyzed the Funds' audited financial statements and audit reports to ensure those financial statements were free of any material misstatements, and reviewed net asset value ("NAV") statements to verify the value of Plaintiffs' investments in DLIF.  The RIA also communicated directly with the Funds' administrator to confirm that a disinterested third party was independently verifying DLI's asset valuations on a monthly basis.

3.     What Plaintiffs and their RIA did not know—and could not have known through the exercise of *any* amount of due diligence—was that there were significant problems with the valuation of the Funds' two largest loan platforms, QuarterSpot, Inc. ("QuarterSpot") and VoIP Guardian Partners I, LLC ("VoIP Guardian").  And, that to conceal those problems, Ross had engineered false payments on bad loans in order to prop up returns and overcharge investors on fees.  The Funds are now being liquidated by a court-appointed receiver (the "Receiver") who has reported that upwards of 70% of the capital invested has been lost.

4.     Deloitte was engaged by DLI to audit the Funds' financial statements and accompanying footnotes in conformity with generally accepted accounting principles and auditing standards ("GAAP" and "GAAS," respectively) for the years ending December 31, 2016, 2017, and 2018.  For 2016 and 2017, Deloitte issued "clean," unqualified audit reports (the "Audit Reports") that negligently ratified and confirmed the false valuations contained in the financial statements and footnotes disseminated to Plaintiffs.  Indeed, Deloitte failed to obtain sufficient audit evidence to support its opinions and thus failed to disclose that the Funds' financial statements, which it certified as accurate, fraudulently and dramatically overstated DLI's assets, net worth, and earnings, and concealed highly material related party transactions.  For example, in its 2017 Audit Report, Deloitte failed to disclose a $55 million related party

- 3 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

transaction involving the sale of QuarterSpot assets at par to DL Global Ltd. ("DL Global"), an investment vehicle run by one of Ross's business associates.

5.     Upon information and belief, Deloitte also was engaged to provide advisory and support services to DLI, which included developing critical valuation policies and procedures that impacted the Funds' NAV and financial statements.  Indeed, investor updates sent directly to Plaintiffs indicated that Deloitte had been providing these services based on its experience auditing similar lending vehicles like DLI and prestige as one of the "Big Four" accounting firms.

6.     Deloitte Tax issued K-1s to Plaintiffs for the years ending December 31, 2016 and 2017, which purported to show each Plaintiff's pro rata share of DLIF's income and expenses and their individual capital account balances determined in accordance with GAAP.  The K-1s, however, incorporated the inflated numbers from Deloitte's year-end audits and, therefore, misrepresented each Plaintiff's capital account balance, as well as their proportionate share of DLIF's net income and expenses for the year.

7.     The Funds' independent administrator, Opus, prepared and sent materially false monthly capital account statements ("Capital Account Statements") and NAV reports directly to Plaintiffs for years.  Instead of conducting an independent verification of the Funds' asset portfolios, as it was obligated to do, Opus simply used DLI's fraudulent information to prepare the Capital Account Statements and NAV reports.  Opus did this despite having specifically represented to Plaintiffs' RIA that it would verify independently DLI's asset valuations based on information it obtained directly from DLI counterparties.  These NAV reports and Capital Account Statements were prepared and distributed on Opus letterhead and were sent directly to each Plaintiff through the online investor portal that Opus maintained.

8.     Instead of rooting out and acting on the red flags they observed, Defendants confirmed the veracity of the Funds' financial statements and issued K-1s, audit reports, NAV

**COMPLAINT AND DEMAND FOR JURY TRIAL**

statements, and capital account statements that misrepresented the Funds' financial condition and corroborated DLI's misstatements year after year. The overstated values contained in these documents obfuscated the fact that the Funds had inadequate liquidity to meet investor redemptions and distributions.

9.     Defendants moreover knew these documents were intended to, and would be, disseminated to and relied upon by Plaintiffs. For its part, Deloitte Tax knew that each individual Plaintiff would rely on the K-1s for the purpose of making investment decisions and paying income taxes. Indeed, the K-1s were addressed to each "Limited Partner" and identified taxable income associated with each Plaintiff's individual capital account. Similarly, Deloitte knew that the Funds' Audit Reports and financial statements would be sent to Plaintiffs, and that Plaintiffs would rely on them in making investment decisions, because DLIF's private placement memorandum ("PPM") and investor communications expressly stated that those documents would be provided to Plaintiffs. And, Opus knew that Plaintiffs would receive and rely on its NAV reports and Capital Account Statements because Opus provided those statements directly to Plaintiffs through the investor portal it was responsible for managing and told Plaintiffs' RIA that it would independently verify DLI's NAV valuations.

10.     Defendants carelessness, inexcusable omissions, neglect, and material misrepresentations give rise to Plaintiffs' claims for: negligent misrepresentation against Deloitte and Deloitte Tax (First Cause of Action) and Opus (Second Cause of Action); and intentional misrepresentation against Opus (Third Cause of Action).

### JURISDICTION

11.     Many, if not all, of the acts and transactions complained of occurred in Los Angeles County, California. The principal executive offices of DLI are located in Los Angeles County and Defendants are either registered to do business in California or conducted substantial

1   business in this County in connection with their work for the Funds.  Upon information and

2   belief, Defendants also performed work for the Funds out of their respective California offices

3   and DLI's office in Glendale.  As a result, Defendants are subject to the jurisdiction of this Court

4   by virtue of their business dealings and transactions in California, by having caused injuries

5   within the County of Los Angeles, and by their violations of California law.

6          12.     This Court has subject matter jurisdiction over all causes of action asserted herein

7   pursuant to the California Constitution, Article VI, Section 10 because Plaintiffs' claims arise

8   under the laws of the State of California.

9          13.     Venue is proper in this Court pursuant to sections 395(a) and 395.5 of the Code of

10  Civil Procedure because the acts giving rise to this action occurred primarily and substantially in

11  Los Angeles County.

12         14.     The amount in controversy is in excess of the jurisdictional limitations and is

13  otherwise subject to the jurisdiction of this Court.

14                                           **PARTIES**

15         **Plaintiffs**

16         15.     Plaintiff Alfred Jackson ("A. Jackson") is an individual who resides in New York,

17  NY.  A. Jackson purchased securities from DLIF in the total principal amount of $1,400,000.

18         16.     Plaintiff Michael Jackson ("M. Jackson") is an individual who resides in Charlotte,

19  NC.  M. Jackson purchased securities from DLIF in the total principal amount of $250,000.

20         17.     Plaintiff Granger Construction Company ("Granger") is a Michigan Corporation

21  with its principal place of business in Lansing, MI.  Granger purchased securities from DLIF in

22  the total principal amount of $1,250,000.

23         18.     Plaintiff Wiener Acquisition Company, LLC ("Wiener") is a New York limited

24  liability company with its principal place of business in Harrison, NY.  Wiener purchased

25  securities from DLIF in the total principal amount of $1,500,000.

26         19.     Plaintiff Maxx Venture Fund H, LLC ("Maxx Venture") is a Delaware limited

27  liability company with its principal place of business in Harrison, NY.  Maxx Venture purchased

28  securities from DLIF in the total principal amount of $1,325,000.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

20.     Plaintiff OGIE, LLC ("OGIE") is a Delaware limited liability company with its principal place of business in Harrison, NY.  OGIE purchased securities from DLIF in the total principal amount of $1,605,000.

21.     Plaintiff The Steven C. Calicchio Foundation ("The Calicchio Foundation") is a New York foundation with its principal place of business in New York, NY.  The Calicchio Foundation purchased securities from DLIF in the total principal amount of $2,370,000.

22.     Plaintiff Charitable Lead Annuity Trust "A" U/W of Steven Calicchio ("CLAT A") is a trust with its principal place of business in New York, NY.   CLAT A purchased securities from DLIF in the total principal amount of $1,220,000.

23.     Plaintiff Charitable Lead Annuity Trust "B" U/W of Steven Calicchio ("CLAT B") is a trust with its principal place of business in New York, NY.  CLAT B purchased securities from DLIF in the total principal amount of $3,550,000.

24.     Plaintiff Exempt Trust U/W of Steven Calicchio FBO Axel Calicchio ("Exempt Trust Axel") is a trust with its principal place of business in New York, NY.  Exempt Trust Axel purchased securities from DLIF in the total principal amount of $240,000.

25.     Plaintiff Exempt Trust U/W of Steven Calicchio FBO Oriana Calicchio ("Exempt Trust Oriana") is a trust with its principal place of business in New York, NY.  Exempt Trust Oriana purchased securities from DLIF in the total principal amount of $240,000.

26.     Plaintiff AJC Legacy Investments, LLC ("AJC") is a Delaware limited liability company with its principal place of business in New York, NY.  AJC purchased securities from DLIF in the total principal amount of $250,000.

27.     Plaintiff OCC Legacy Investments, LLC ("OCC") is a Delaware limited liability company with its principal place of business in New York, NY.  OCC purchased securities from DLIF in the total principal amount of $250,000.

28.     Plaintiff Millicent Calicchio ("Calicchio") is an individual who resides in New New York, NY.  Calicchio purchased securities from DLIF in the total principal amount of $2,500,000.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

29.     Plaintiff Valerie Sabet ("Sabet") is a British citizen who resides in New York, NY. Sabet purchased securities from DLIF in the total principal amount of $1,500,000.

30.     Siridean Advisors LLC is Plaintiffs' RIA based in New York, NY.  At all relevant times, the RIA acted as Plaintiffs' financial advisor and agent in connection with their investments in DLI.  The RIA managed the due diligence process for Plaintiffs' investments in DLIF, performed ongoing due diligence, provided Plaintiffs with information on all aspects of DLI's business, operations, and financial condition, and received both written and oral communications from Defendants in connection with Plaintiffs' investments in the Fund.

31.     Plaintiffs bring these claims in their respective individual capacities as limited partners in DLIF.  As described below, each Plaintiff was induced by Defendants' misrepresentations to invest, make additional investments, and/or to hold his or her investments in DLIF to the exclusion of other investment opportunities.  More specifically, each Plaintiff invested at different times in different amounts in reliance on the representations that each Defendant made to Plaintiffs' RIA.  Each Plaintiff's damages are unique and cannot be determined on a pro-rata basis with other limited partners in DLIF since each Plaintiff paid different amounts for management and incentive fees over the course of their investment.

32.     Moreover, separate and apart from their out of pocket losses, each Plaintiff has sustained damages related to the payment of taxes on illusory income.  Because DLIF is a "pass through" entity with no independently taxable income, the profits and losses of the Fund are allocated to the limited partners in accordance with each limited partner's distributive share. Each individual limited partner pays taxes on the profits allocated to his or her capital account and may offset other taxable income with losses allocated to such capital account.  The Fund does not pay taxes on profits nor offset against losses allocated to the capital accounts.  As such, DLI would have no standing to recover such damages, which are unique to each Plaintiff.

**Defendants**

33.     Deloitte & Touche LLP and Deloitte Tax, LLP are Delaware limited liability partnerships with a principal place of business at 30 Rockefeller Plaza, New York, NY.  Upon information and belief, Deloitte and Deloitte Tax also have twelve (12) offices throughout

**COMPLAINT AND DEMAND FOR JURY TRIAL**

California.  Deloitte is the accounting arm of Deloitte, LLP, the United States affiliate of the "Big Four" international accounting firm Deloitte Touche Tohmatsu Limited which, upon information and belief, reported an aggregate member firm revenue of $43.2 billion for the fiscal year ending May 2018.  As part of its business, Deloitte provides clients with advisory services, audits and financial statement reviews.  Deloitte served as the Funds' independent outside auditor and provided advisory services for the calendar years ending December 31, 2016, 2017, and 2018.  Deloitte Tax prepared individual K-1s that identified taxable income associated with each Plaintiff's investments in DLIF for the calendar years ending December 31, 2016 and 2017.

34.     Opus Fund Services LLC is a Delaware limited liability company with a principal place of business in Bermuda, and an office in Brentwood, California.  Opus is a full-service, domestic, and international fund administrator.  Opus served as DLI's independent administrator from early 2012 through September 26, 2019.

35.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1-50, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to include DOE defendants' true names and capacities when the identities of these defendants have been ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of these fictitiously named defendants is in some way responsible for each of the occurrences as herein alleged and that Plaintiffs' damages as herein alleged were proximately caused by the conduct of each said fictitiously named defendants.

## GENERAL ALLEGATIONS

### The DLI Fund Structure

36.     Ross formed DLI in 2012 to invest in online lending marketplaces and to manage several private funds organized in a "master-feeder" construct.  In a "master-feeder" construct, limited partners, like Plaintiffs, make direct investments in distinct limited liability partnerships (*i.e.*, "feeder" funds) which, in turn, make investments in a "master" limited partnership that houses most of the fund's assets.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

37.     DLI was the general partner and investment manager of two "feeder" funds: (i) DLIF, a limited partnership organized under the laws of Delaware, and (ii) DLIFF, a Cayman Islands exempted company.

38.     DLIF and DLIFF funneled investor funds to DLI, which then provided the funds to DLI-related entities, including DLI Capital.  DLI Capital is the "master" fund through which the funds obtained by DLIF and DLIFF were invested, with DLI Capital in turn investing through DLI Assets Bravo and DLI Assets.

39.     DLI categorized the Funds' assets within a "fair value hierarchy" as Level 1, Level 2, or Level 3 assets depending on the data used to measure the fair value of the asset.

40.     Level 1 assets are those whose inputs can be verified through comparison to identical assets in the active market.  Level 1 assets include, for example, stocks and bonds that have a mark to market mechanism for determining their value.

41.     Level 2 assets are those whose value can be approximated using models or extrapolation methods from known, observable price market values or other data.  Level 2 assets include, for example, corporate bonds and mortgage-backed securities.

42.     Level 3 assets are those whose value cannot be determined through analysis of observable inputs such as market prices or models.  Rather, the value of Level 3 assets must be determined through the best available information and may require some measure of estimation or risk-adjusted valuation.

43.     DLI grew its asset and investor base by advertising its purported impressive returns and use of "world class vendors."  Indeed, DLIF's PPM and related marketing materials touted DLI's annual ten to twelve percent (10-12%) returns (which were verified by Deloitte and Opus) and thirty-five (35) day liquidity period.

44.     DLI charged investors both a management and performance fee based on DLI's assets.  The management fee was calculated as one percent (1%) of DLI Capital's gross asset amount as of the beginning of each month, including all side pocket investments.  The performance fee was incurred when DLI Capital's NAV exceeded its prior high NAV and was calculated as twenty percent (20%) of these earnings before interest and taxes.

COMPLAINT AND DEMAND FOR JURY TRIAL

**The Funds' Operations and Loan Portfolios**

45.     Since inception, the Funds principally invested in short-term loans, lines of credit, purchased receivables, and other debt obligations issued by, or originated through, online lending platforms ("Notes").

46.     Specifically, DLIF purchased Notes directly from online business and retail lenders with whom it had negotiated long term loan acquisition and servicing relationships and held the Notes to maturity, with the goal of delivering to investors a stable stream of investment returns derived from interest income.  DLIF also financed non-bank lenders directly and provided revolving loan facilities to special purpose entities ("SPEs") that own a portfolio of Notes originated by multiple third-party loan originators (the "Counterparties" or "Platforms") which sponsored the SPE.

47.     The Funds' investments in Notes were categorized as Level 3 investments.

48.     While DLI's loan portfolio consisted of investments with various Counterparties (*e.g.*, borrowers), its two largest investments were QuarterSpot and VoIP Guardian, both of which were chronically overvalued.

**DLI's QuarterSpot Loan Portfolio**

49.     QuarterSpot is an online small business and retail lender and was one of DLI's longest-standing investments.

50.     Beginning in August 2013, DLI agreed to purchase from QuarterSpot unsecured payment-dependent promissory notes.  Under the terms of this agreement, QuarterSpot continued to service the loans in exchange for a fee that was later memorialized in several internal and audit-related documents at 17.5% of interest collected.

51.     Between August 2013 and June 2017, DLI's QuarterSpot position (loan principal plus cash value) grew dramatically from $427,333 to $149,608,733.

52.     As part of DLI's monthly reporting and closing process, QuarterSpot was required to provide DLI with loan-level data, including performance and payment figures for each individual loan.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

53.     DLI then used this loan-level information to determine how the QuarterSpot loans were performing, and to create a monthly closing report and valuation for DLI's QuarterSpot portfolio.

54.     The monthly fair values of QuarterSpot, together with each of the Fund's other investments, were used to determine the aggregate fair value of the Fund's portfolio and, in turn, DLI Capital's value.

55.     In or around July 2017, DLI sent an Investor Update stating that DLI had segregated the QuarterSpot portfolio into a temporary "side pocket" account after QuarterSpot refused to enter into a credit facility agreement.

56.     Traditionally, a side pocket is used for non-performing assets that have limited liquidity.  According to DLI, the QuarterSpot portfolio was placed in a temporary side pocket so an outside valuation firm, Acuitas, Inc., could price all of the QuarterSpot loans.

57.     In late September 2017, DLI entered into a related party transaction to sell approximately $55 million of the QuarterSpot assets at par value to DL Global, a foreign investment vehicle run by one of Ross's business associates.

58.     Despite this sale, DLIF maintained a portion of its position in QuarterSpot.

59.     On March 19, 2019, DLI announced to Fund investors for the first time, that QuarterSpot's value may have been materially overstated for years.  Thereafter, Ross formally resigned all positions at DLI on March 18, 2019 and ceded control to the Fund's management committee.

**DLI's VoIP Guardian Loan Portfolio**

60.     Since 2015, DLI similarly provided a revolving loan facility to VoIP Guardian, an SPE.  VoIP Guardian was in the business of financing short-term commercial receivables from telecommunications providers.  Once financed, the telecom receivables became payable directly to VoIP Guardian and those expected payments served as the collateral against which DLI lent money to VoIP Guardian.

61.     In just two years, the amount that DLI extended to VoIP Guardian under the loan facility ballooned from $32.83 million in 2015 to $180,396,984 as of December 31, 2017.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

62.     From 2015 until November 2018, VoIP Guardian made regular interest payments due on the loans.  Beginning in December 2018, however, VoIP Guardian missed a portion of its interest payment, claiming that it had not received timely payments totaling $18 million from its own obligors.  By this time, however, approximately twenty five percent (25%) of the Fund's capital was invested in VoIP Guardian.

63.     Throughout January 2019, VoIP Guardian repeatedly reassured the Fund that the payments would be forthcoming.  Given VoIP Guardian's payment history, DLI reported to investors that it had credited those reassurances.

64.     But by February 2019, DLI announced that it had suspended redemptions because VoIP Guardian had ceased making payments on the $192 million revolving loan facility.  DLI further stated that it suspected that the cessation of payments was likely the result of misconduct (although it had not yet determined by whom) and that a substantial portion of the loan may not be recoverable.

65.     On March 2019, VoIP Guardian filed a voluntary Chapter 7 petition for liquidation in the Central District of California.  See Petition of VOIP Guardian Partners I, LLC, Slip no. 19-bk-12607-BR (C.D. Cal. March 11, 2019).

66.     As of August 16, 2019, the total amount of credit that DLI extended to VoIP Guardian was $203,459,871.69.

**Early Problems with DLI's Loan
Portfolios and the SEC Examination**

67.     As early as 2014, Ross was aware of problems with the quality of DLI's QuarterSpot loan portfolio.

68.     Beginning in or around the first quarter of 2015, the SEC conducted an examination of DLI's compliance and business practices that lasted through July, 2018.

69.     After concluding its examination, the SEC issued DLI a deficiency letter on or about July 25, 2018 (the "Deficiency Letter").

70.     Deficiency letters are generally intended to highlight flaws in an advisor's regulatory compliance controls or business practices and to identify areas for improvement.

- 13 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

71.     Upon information and belief, the Deficiency Letter outlined specific concerns related to DLI's compliance and business practices, including Ross's communications and dealings with DLI Counterparties.

72.     Upon information and belief, Deloitte, Deloitte Tax, and Opus were aware of the concerns raised by the SEC during what appears to be an atypically long examination (lasting over three years), received copies of the Deficiency Letter, and assisted DLI in responding to the compliance gaps identified by the SEC.

### DLI's Collapse and the Appointment of a Receiver

73.     On March 22, 2019, the SEC filed a Complaint charging DLI with a multi-year fraud that resulted in approximately $11 million in over-charged management and performance fees, as well as inflated returns (the "Complaint").

74.     According to the SEC, Ross actively took steps to conceal problems with the quality of DLI's QuarterSpot loan portfolio by: encouraging QuarterSpot principals to manipulate the loan-level information that it reported to DLI, directing QuarterSpot to delay recognizing delinquent loans, and falsifying borrower payment information to make it appear as though payments had been made by borrowers, when they had not.

75.     More specifically, Ross emailed QuarterSpot principals spreadsheets containing falsified payment figures at the beginning of each month.

76.     The SEC estimates that the total value of the falsified payment figures in a given month ranged from just under $20,000 to just under $100,000, and that the falsification of borrower payment information led DLI to value many of the nonperforming QuarterSpot loans at par when the values should have been reduced to zero.

77.     On April 1, 2019, a Receiver was appointed to oversee the DLI Funds.

78.      To date, the Receiver has taken custody of all assets and records and is currently seeking to maximize value for investors, creditors, and interested third parties.

79.     As for VoIP Guardian, the Receiver has explained that, while the loan to VoIP Guardian has a par value on the Receiver's books of over $190 million, "there are substantial questions and concerns regarding collection of the underlying telecommunications accounts

- 14 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

receivable, not the least of which is the bankruptcy filing and that approximately $22 million dollars in funds are being held in The Netherlands as a result of a government seizure related to a criminal investigation of Rodney Omanoff [VoIP's President] and others for money laundering and other criminal claims."

80.     The Receiver also has liquidated numerous other DLI assets at a fraction of their reported value, demonstrating that Ross's fraud was not limited to overvaluing DLI's positions in QuarterSpot and VoIP Guardian.

81.     Based on the Funds' financial statements, it is now clear that that DLI was using new investor contributions to pay redemptions.  Indeed, for the year ending December 21, 2017, DLIF received $217,272,857 in capital contributions and paid $351,209,655 in withdrawals. And, between January 1, 2018 and April 27, 2018 alone, DLIF received $71,200,000 million in capital contributions and paid $108,700,000 million in withdrawals.  Thus, in only sixteen months DLIF's limited partner withdrawals eclipsed capital contributions received by $171,436,798.

82.     It was not until the commencement of the SEC action in March 2019 that Plaintiffs learned that: DLI's NAV had been overstated; the Funds' financial statements and Audit Reports contained material misstatements and failed to disclose related party transactions; and Plaintiffs' Capital Account Statements and K-1s were inaccurate.

**Opus's Misrepresentations Concerning the Fund's NAV**
**and its Responsibilities as the "Independent "Administrator**

83.     Opus served as DLI's purported independent administrator from early 2012 through September 2019.  On or about August 19, 2015, prior to Plaintiffs' initial investment in DLIF, the RIA received communications from Rocco DiBenedetto ("DiBenedetto") and Stephen Giannone ("Giannone") at Opus as part of its due diligence investigation.  According to DiBenedetto and other materials provided by Opus, Opus was responsible for performing extensive day-to-day administrative services for DLI including, but not limited to: preparing and distributing monthly reports and communications from Ross (generally referred to as "Investor Updates") directly to investors; maintaining the Fund's financial books and records; accepting and processing redemptions; and maintaining the investor due diligence portal (the "Investor

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Portal"). The Investor Portal provided investors with access to detailed information concerning DLI's asset portfolio and its specific Counterparties, including the valuation of its various Counterparty positions by unpaid principal balance and profit and loss information for those Counterparty positions.

84.     Additionally, and of particular significance to Plaintiffs, DiBenedetto represented that Opus was responsible for (i) preparing and distributing to each limited partner a monthly account statement ("Capital Statements") and (ii) calculating and reporting the Fund's NAV at the end of each month based on the information and performance data that it *received directly from Fund Counterparties*—as opposed to calculating the NAV based on information and performance data provided by DLI.

85.     Plaintiffs' relied on Opus' representations to the RIA concerning its independent verifications and oversight in deciding to make their initial investments in DLIF.

**Plaintiffs' Capital Account Statements**

86.     As represented to Plaintiffs' RIA, Opus sent each Plaintiff a personalized monthly Capital Statement that was entitled "Statement of Changes in Capital" and emblazoned with the Opus Fund Services trade name and logo.

87.     The Capital Statements conveyed "Current Period," "Year to Date," and "Inception to Date" information to investors on a month-to-month basis for each limited partner's capital account and included each limited partner's: (i) "Beginning Balance;" (ii) capital activity, including "Subscriptions," "Redemptions," "Net Profit/Loss," and "Distributions;" (iii) the "Ending Balance;" and (iv) the "Net Return."

88.     Opus sent these Capital Statements directly to each Plaintiff through the Investor Portal. As a result, Opus knew that Plaintiffs would use their individualized Capital Statements to verify the "value" of their investment, to verify DLI's performance, and to make investment decisions regarding DLIF.

**The Monthly NAV Statements**

89.     Opus also provided independent monthly NAV calculations directly to Plaintiffs through the Investor Portal.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

90.     The NAV was critical to Plaintiffs' decisions to make their initial investments, invest additional amounts, and to hold their investments over time.  Indeed, the prices paid by Plaintiffs for their limited partnership interests were based directly on DLI Capital's reported NAV.  By tracking changes in the NAV after they purchased their interests, Plaintiffs could evaluate whether the Fund's investments were successful.  If the reported NAV had declined over time, or if it was disclosed that NAV was being calculated in an improper fashion, Plaintiffs would have sold their interests.  Additionally, Plaintiffs' subsequent reported profits, as well as their share of performance and management fees also turned on Opus' calculations.

### DLI's Auditors, Tax Professionals, and Applicable Industry Standards

91.     Over the years, DLI had a high auditor turnover rate.  BDO USA, LLP served as DLI's auditor for the calendar years ending December 31, 2012 and 2013.  EisnerAmper LLP was DLI's auditor for the calendar years ending December 31, 2013, 2014, and 2015.  Thereafter, Deloitte became DLI's third auditor in five years.  Deloitte issued Audit Reports and assisted in preparation of the Funds' audited financial statements for the calendar years ending December 31, 2016 and 2017.  Deloitte's Audit Reports bore Deloitte's letterhead, listed Deloitte's San Francisco address, and were signed by "Deloitte & Touche LLP."

92.     Auditors, like Deloitte, have obligations under the professional standards enumerated by the American Institute of Certified Public Accountants ("AICPA") in performing private hedge fund audits.[2]  In particular, auditors are required to adhere to the rules and regulations promulgated by the AICPA, including:

a.  An auditor conducting an audit in accordance with GAAS is responsible for obtaining reasonable assurance that the financial statements as a whole are free from material misstatement, whether caused by fraud or error.  AU-C, § 240.05.

---

[2] The AICPA is the organization that develops and establishes professional standards and auditors' overall responsibilities when conducting an audit of financial statements.  The organization issues detailed interpretations of GAAS rules and auditor responsibilities through the Statements of Accounting Standards, which are codified into AU sections ("AU").  See AU-C, §§ 200.01, 200.02.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

b.   The auditor should perform risk assessment procedures to provide a basis for the identification and assessment of risks of material misstatement in the financial statement and relevant assertion levels.  AU-C, § 315.05.

c.   In evaluating and assessing the risks of material misstatement [in financial statements], as required by [AU-C § 315] the auditor should evaluate the degree of estimation uncertainty associated with the accounting estimate and determine whether, in the auditor's professional judgment, any of those accounting estimates that have been identified as having high estimation uncertainty that give rise to significant risks.  AU-C, § 540.10-11.

d.   If the auditor considers it necessary to draw users' attention to a matter appropriately presented or disclosed in the financial statements that, in the auditor's professional judgment, is of such importance that it is fundamental to users' understanding of the financial statements, the auditor should include an emphasis-of-matter paragraph in the auditor's report, provided that the auditor has obtained sufficient appropriate audit evidence that the matter is not materially misstated in the financial statements.  AU-C, § 706.06.

e.   The auditor has a responsibility to perform audit procedures to identify, assess, and respond to the risks of material misstatement arising from the entity's failure to appropriately account for or disclose related party relationships, transactions, or balances.  AU-C, § 540.04.

93.   The Public Company Accounting Oversight Board ("PCAOB") is also charged with overseeing public company audits and requires auditors to test, and to document their testing of, management's assumptions and other aspects of financial statement issuers' accounting estimates.  PCAOB Rel. 2007-001, at 10; see also AU-C, § 540.06.  Auditors are solely responsible for reviewing, auditing, and expressing opinions concerning a fund's financial statements, as well as testing controls, and, among other things, are required to:

a.   Plan and perform audits to obtain reasonable assurance about whether the funds' financial statements were free from material misstatement whether due to fraud or error, and fairly presented the funds' financial position and results of operations;

b.   Perform audits in accordance with GAAS and other applicable standards and obtain evidence supporting the valuation of the funds' investments included in their financial statements; and,

c.   Perform audits with due care, professional skepticism, and in a manner sufficient to address the existence of and disclosure requirements for related party transactions.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

94.     Deloitte was therefore required to adhere to the above-referenced standards to ensure that the Funds' financial statements accurately represented its financial condition and were free from material misstatement.  Additionally, Deloitte was required to evaluate whether there was a substantial doubt about the Funds' ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited.  See AS 2415.

95.     Similarly, Deloitte Tax was subject to the AICPA's Statements on Standards for Tax Services ("SSTSs") in preparing DLI tax and returns and investors related K-1s.  The SSTSs and interpretations delineate tax professionals' responsibilities to taxpayers, the public, and the profession.  While tax professionals, like Deloitte Tax, may generally rely on information furnished by third parties, the SSTSs direct that tax professionals make inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent on the basis of other facts known to the member.  Upon information and belief, Deloitte Tax did not perform adequate due diligence on information they received from the Deloitte auditors to properly prepare the DLI tax returns which resulted in K-1s being sent to Plaintiffs that inflated asset values and income flowing through to Plaintiffs.

**Deloitte's Audit, Tax, and Advisory Services**

96.     Deloitte and Deloitte Tax provided *integrated* audit, advisory, and tax services to DLI Capital and its subsidiaries (including DLIF), and was identified in DLIF's PPM and related marketing materials as the Funds' independent auditor.

97.     Monthly Investor Updates delivered to Plaintiffs also touted Deloitte's and Deloitte Tax's retention for the performance of audit and tax work for the Funds.  For example, an October 5, 2016 Investor Update sent to investors by Opus announced that DLI had engaged Deloitte for its 2016 audit.  Specifically, the Investor Update stated:

> At 244,000 professionals and $36 billion in revenue, Deloitte is the largest professional services network in the world. Looking beyond their prestigious brand, Deloitte has a particular commitment to fin-tech / marketplace lending / private credit.  They audit LendingClub, Prosper, BlackRock, Jeffries, Paypal, Orchard, Colchis, and many of the other established non-bank lenders that have adopted a

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Big 4 audit firm. We look forward to a smooth audit that will take advantage of Deloitte's scale to deliver our audit on a shorter timeline than last year.

*****

For taxable domestic retail investors, a potentially important but somewhat obscure benefit of this transition will be changes to the Form K-1 that should reduce the "Other Income" line.  As a result of the structure change, management fees and most fund expenses will now be expenses of the Master fund.

98.     Based on the repeated use of Deloitte's and Deloitte Tax's names in PPMs, Investor Updates, and other marketing materials, Deloitte and Deloitte Tax knew that their names were being used by DLI to market the Funds, giving the Funds an air of legitimacy to draw in investors.  Upon information and belief, Deloitte provided its consent for the inclusion of its name in marketing and advertising documents.

99.     Upon information and belief, Deloitte and Deloitte Tax worked closely with one another in performing services for the Funds including, but not limited to, sharing audit and investment information across integrated systems.

**Deloitte's Audit Reports Whitewash the**
**Funds' Financial Condition and Valuation Practices**

100.     For the calendar years ending December 31, 2016 (issued April 27, 2017) and December 31, 2017 (issued April 27, 2018), Deloitte issued Audit Reports for DLIF stating that (i) the audit at issue was performed in accordance with GAAS, and (ii) the information contained in the financial statements, including the accompanying footnotes, had been prepared and reported in conformity with GAAP.

101.     Specifically, in each Audit Report, Deloitte stated that:

a.     Its Audit was performed in accordance with GAAS;

b.     It believed the audit evidence that it had obtained was sufficient and appropriate to provide a basis for its Audit Report;

c.     The financial statements subject to the audit were prepared in conformity with GAAP;

d.     The financial statements subject to the audit presented fairly, in all material respects, the financial position and results of operations and cash flows of PPCO as of December 31 of the relevant year; and,

**COMPLAINT AND DEMAND FOR JURY TRIAL**

e.   The financial statements subject to the audit were free of material misstatement.

102.   Both Deloitte's 2016 and 2017 Audit Reports identified two main assets on DLIF's balance sheet: (i) an equity investment in DLI Capital; and (ii) a note receivable from DLI Capital.  As a result, both Audit Reports referenced and attached DLI Capital's consolidated financial statements, including the consolidated condensed schedule of investments, and audit report prepared by Deloitte.

103.   Deloitte's Audit Reports corroborated DLIF's and DLI Capital's financial statements, which averred that DLIF and DLI Capital were highly successful hedge funds, growing over the course of each year.   Indeed, Deloitte's Audit Report confirmed that:

a.   for the year ending December 31, 2016, the total claimed fair value of investments were $801,694,006 for DLIF and $804,375,693 for DLI Capital, and $122,347,560 for QuarterSpot and $98,879,915 for VoIP Guardian; and

b.   for the year ending December 31, 2017, the total claimed fair value of investments were $ 710,507,683 for DLIF and $ 819,274,968 for DLI Capital, and $50,014,245 for QuarterSpot and $180,396,984 for VoIP Guardian.

104.   Deloitte's 2017 Audit Reports, notably, omitted the segregation of QuarterSpot into a side pocket investment maintained on DLI Capital's financial statements.  Nor did it disclose a related party sale of approximately $55 million of the Fund's QuarterSpot position at par to DL Global that took place in September of 2017.

105.   As to VoIP Guardian, Deloitte's 2017 Audit Report failed to disclose material concentration risks associated with the revolving line of credit.  Specifically, Deloitte's 2017 Audit Report did not disclose that VoIP Guardian had only six Counterparty borrowers, and that approximately 82% of VoIP Guardian's $192 million in "Notes Receivable" securing its debt were notes to just _two_ foreign companies: $101,165,115 to Telacme Limited and $58,004,470 to Najd Technologies Limited.  Furthermore, the 2017 Audit Report failed disclose that _principals_ of DLI owned a 4.99% interest in VoIP Guardian.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

106.    Furthermore, Deloitte did not disclose that there was a substantial doubt about DLIF's ability to continue as a going concern for a reasonable period of time even though DLIF's limited partner withdrawals eclipsed capital contributions received by $171,436,798 over the previous sixteen months.

107.    Upon information and belief, Deloitte took no action to investigate the segregation and resolution of the QuarterSpot side pocket, the related party transactions, and the credit risks which indicated that the Funds' financial statements were materially inaccurate, in derogation of its responsibilities as a public accounting firm (as well as GAAS and GAAP).

108.    Rather, it accepted what Ross and DLI represented at face value in violation of its obligation to obtain reasonable assurances that the Funds' financial statements were free from material misstatement.

109.    Deloitte's 2016 and 2017 Audit Reports are attached hereto as <u>Exhibits A-B</u>.

110.    Plaintiffs relied on Deloitte's Audit Reports and the audited financial statements it helped prepare in determining whether to hold or make additional investments in DLI.

**Deloitte Tax Prepared K-1s that Materially Overstated the
Taxable Income Associated with Each Plaintiff's Capital Account**

111.    Deloitte Tax prepared the 2016 and 2017 individual K-1s for each Plaintiff, which incorporated the Audit Reports' year-end numbers and reported each Plaintiff's pro rata share of the Fund's income and expenses using information derived from Deloitte's audit work.  Upon information and belief, Deloitte Tax worked closely with Deloitte to confirm the value of Plaintiff's contributions and withdrawals each year, as well as the value of DLIF's and DLI Capital's assets each year.

112.    These K-1s were addressed to each "Limited Partner" and identified taxable income associated with each Plaintiff's capital account, certifying to Plaintiffs that real investment income was earned for each account.

113.    The cover letter accompanying each K-1 that was addressed to each Plaintiff bore Deloitte's letterhead and was signed by "Deloitte Tax LLP."  Deloitte thus expected and intended for Plaintiffs to rely on the thoroughness, accuracy, and integrity of the K-1s, and Deloitte Tax

- 22 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1  understood that each specific Plaintiff would be relying on the K-1s in paying his or her federal
2  and state income taxes.

3      114.   Deloitte Tax's K-1s materially overstated Plaintiffs' capital account balances and
4  the taxable income associated therewith.

5      115.   Plaintiffs relied on Deloitte Tax's K-1s in deciding to hold and make additional
6  investments in DLIF.

7                    **FIRST CAUSE OF ACTION**

8          **(Negligent Misrepresentation Against Deloitte & Deloitte Tax)**

9      116.   Plaintiffs repeat and reallege the allegations in the foregoing Paragraphs as if
10  restated in full herein.

11      117.   Collectively, Deloitte and Deloitte Tax audited DLI's year-end 2016 and 2017
12  financial statements, continued to perform audit work for DLI through at least 2018, and prepared
13  K-1s specifically for each individual Plaintiff.

14      118.   Deloitte and Deloitte Tax each owed a duty to exercise reasonable care to the
15  limited partners, including Plaintiffs, to perform its audit and tax work in accordance with GAAS
16  and SSTSs, to provide Plaintiffs with accurate K-1s and Audit Reports, and to design policies
17  relative to the Funds' financial statements in accordance with GAAP.

18      119.   Deloitte and Deloitte Tax owed these duties directly to Plaintiffs separate and apart
19  from the contractual duties they owed to DLI.  Deloitte Tax assumed the duty to prepare
20  Plaintiffs' individual K-1s, and Deloitte assumed the duty to prepare independent Audit Reports
21  and to create policies that directly affected DLI's financial statements for the benefit of the
22  limited partners, including Plaintiffs.  Deloitte and Deloitte Tax were fully aware that Plaintiffs
23  would necessarily rely on the K-1s, Audit Reports, and financial statements to calculate
24  individual tax liabilities and make individual investment decisions.

25      120.   In its Audit Reports, Deloitte represented to Plaintiffs that it had audited DLI's
26  financial statements in accordance with GAAS and found the Funds' financial statements to
27  conform to GAAP and to be free of material misstatement, whether due to fraud or error.

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

121.     The representations in the Audit Reports that Deloitte prepared were false and misleading because Deloitte failed to conform to the professional standards for accountants, including by (i) failing to conduct its Audits of the Funds in accordance with GAAS and GAAP, and (ii) failing to provide accurate information in the Audit Reports it prepared for Plaintiffs.

122.     Specifically, Deloitte failed to exercise the applicable audit standard of due professional care when auditing the Funds' financial statements, including by failing to, (i) comply with applicable GAAS standards in the planning and execution of the audits, (ii) test internal controls including management's ability to override of such controls, (iii) detect the fraud, (iv) determine if previously issued financial statements needed revision due to inadequate internal controls and possible override of internal controls by management, and (v) otherwise take various actions to make the facts known to Plaintiffs who Deloitte knew were relying on the Audit Reports and financial statements.

123.     Deloitte's 2017 Audit Report also contained material misstatements related to QuarterSpot.  Specifically, Deloitte failed to disclose the segregation of QuarterSpot into a side pocket which, according to the Fund's PPM, was to be carried and disclosed on DLI Capital's financial statements.  Deloitte also failed to disclose the related party transfer to DL Global in its 2017 Audit Report as required by GAAS.

124.     Deloitte Tax also supplied false information in the K-1s that it prepared for Plaintiffs in violation of applicable SSTSs.  These K-1s identified taxable income associated with each account and certified that real investment income existed for each Plaintiffs' account.

125.     Had Deloitte performed audits that conformed to GAAS, it would have discovered that the Funds' financial statements were false and that DLI did not have the assets they reported.  Moreover, Deloitte Tax would not have issued K-1s to Plaintiffs that reported sham income and caused Plaintiffs to pay taxes on funds that did not exist.

126.     Deloitte and Deloitte Tax failed to exercise reasonable care and competence in performing its Audits and communicating false information regarding the value of Plaintiffs' capital accounts to Plaintiffs.  And, Deloitte and Deloitte Tax were negligent or reckless in communicating false information they believed to be true to Plaintiffs, on which Plaintiffs

**COMPLAINT AND DEMAND FOR JURY TRIAL**

justifiably relied, to guide Plaintiffs in their investment decisions, including calculating and paying their individual tax liabilities and performance fees.

127.   Deloitte and Deloitte Tax knew and intended that the Funds' financial statements, Audit Reports, and K-1s would be provided to limited partners, including Plaintiffs, and would be relied on by them in making investment decisions and calculating their individual tax liabilities. Deloitte knew the identity of each Plaintiff because it sent audit confirmations directly to Plaintiffs and because Deloitte Tax prepared K-1s for each Plaintiff which listed each Plaintiff's name and home address.

128.   Plaintiffs were the specific class of persons who relied upon Deloitte's Audit Reports, audited financial statements, and K-1s and who Deloitte and Deloitte Tax knew and intended would rely upon that work.  Specifically, Deloitte expected and intended that Plaintiffs would rely on the Audit Reports and financial statements in deciding whether to invest, hold, sell or make additional investments in DLIF.  Deloitte Tax also expected Plaintiffs to rely on the K-1s, which it represented were based on Deloitte's Audit Reports, in preparing and paying his or her federal and state income taxes.

129.   Plaintiffs justifiably relied upon the materially misleading Audit Reports, financial statements, and K-1s, without knowing they were false, in deciding whether to hold their investments or make additional investments in DLIF, making excessive management and performance fee payments, and paying personal income tax.

130.   Plaintiffs' reliance on Deloitte's and Deloitte Tax's misrepresentations was a substantial factor in causing Plaintiffs' harm in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against Deloitte and Deloitte Tax as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation Against Opus)

131.   Plaintiffs repeat and reallege the allegations in the foregoing Paragraphs as if restated in full herein.

- 25 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

132.    Opus served as DLI's administrator from 2012 through 2019.  As DLI's administrator, Opus had a unique and special expertise and superior position with respect to providing administrative services and calculating the Funds' NAV and account balances.  As a result, Opus owed the limited partners, including Plaintiffs, a duty to exercise reasonable care in the performance of its duties as DLI's administrator.

133.    Opus owed these duties directly to Plaintiffs separate and apart from the contractual duties Opus owed to DLI.  Opus assumed the duty to prepare Capital Statements for the benefit of each individual limited partner, including each Plaintiff, and Opus was fully aware that Plaintiffs would necessarily rely on the Capital Statements and NAV calculations to make investment decisions.

134.    In its Capital Statements, Opus made representations about the Funds' NAV and the funds available in each Plaintiff's capital account.

135.    Opus' NAV calculations and Capital Statements were false.  The NAV calculations were inflated and the Capital Accounts did not hold the amounts that Opus had represented.

136.    In issuing the NAV calculations and Capital Statements, Opus acted negligently because it knew or had access to underlying Counterparty information and performance data which showed that its Capital Statements were false.  Opus also acted negligently or recklessly by failing to verify the information received directly from Counterparties despite a duty to scrutinize and verify independently information relating to the NAV and Capital Statements.  In addition, its failure to check or verify the information was reckless because Opus was aware of the increased risks surrounding the Fund's assets because they had no independent observable market input.

137.    Opus knew and intended that the Capital statements and NAV calculations would be provided to limited partners, including Plaintiffs, and that they would be relied on by Plaintiffs in making investment decisions.  Opus knew the identity of each Plaintiff because Opus prepared Capital Statements for each Plaintiff which listed each Plaintiff's name and home address.

138.    Plaintiffs were a specific class of persons who relied upon Opus' reports and statements and Opus knew and intended would rely upon that work.  And, Opus made the false

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1   representations it believed to be true knowing that Plaintiffs would use and rely upon the

2   misrepresentations for the particular purpose of determining whether to invest, make additional

3   investments, and hold their investments in the Fund.

4        139.   Plaintiffs justifiably relied upon the materially misleading Capital Statements and

5   NAV calculations, without knowing they were false, in deciding to invest, make additional

6   investments, and hold their investments in DLIF.  Plaintiffs also relied on Opus' NAV

7   calculations in making excessive performance and incentive payments.

8        140.   Plaintiffs reliance on Opus' misrepresentation was a substantial factor in causing

9   Plaintiffs' harm in amount to be determined at trial.

10        WHEREFORE, Plaintiffs pray for judgment against the Deloitte Defendants as hereinafter

11   set forth.

12   **THIRD CAUSE OF ACTION**

13   **(Intentional Misrepresentation Against Opus)**

14        141.   Plaintiffs repeat and reallege the allegations in the foregoing Paragraphs as if

15   restated in full herein.

16        142.   Prior to Plaintiffs' initial investment in DLIF, Opus made materially false and

17   misleading statements to Plaintiffs' RIA concerning its role and oversight as DLI's independent

18   administrator.  Specifically, and as set forth in Paragraphs 83 through 84 above, Opus made direct

19   representations to Plaintiffs' RIA that it verified the asset valuations of DLI's Counterparties and

20   independently calculated the Funds' NAV based on the platform data that it received directly

21   from those Counterparties.

22        143.   Upon information and belief, these material representations were in fact

23   intentionally false.  Specifically, Opus knew that it did not independently verify the underlying

24   asset valuations of DLI Counterparties, did not perform independent NAV calculations, and did

25   not receive platform data directly from DLI Counterparties.  Had Opus independently verified the

26   underlying asset valuations based on platform data that it received *directly* from Fund

27   Counterparties, Opus would have identified, among other things, the systematic overvaluation of

28   the Fund's positions in QuarterSpot and VoIP Guardian.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

144.    Opus' misstatements concerning its role as DLI's administrator were designed to induce Plaintiffs' reliance and investments in DLIF.  Specifically, Opus communicated these material misrepresentations directly to Plaintiffs' RIA prior to Plaintiffs' initial investments in DLIF.  At that time, Opus knew the RIA was performing pre-investment due diligence on behalf of Plaintiffs and that its misrepresentations concerning independent oversight and superior access to Counterparty information would entice Plaintiffs to invest in DLIF.

145.    Plaintiffs did not know, nor could they have discovered through the exercise of any amount of due diligence, that Opus' representations about the services it performed were false at the time they were made.

146.    Plaintiffs justifiably relied on Opus' misrepresentations and relied upon the absence of omitted facts necessary to make the facts represented not misleading.  As previously set forth herein, in reliance on the Opus' misrepresentations and omissions, Plaintiffs, among other things, deciding to invest in DLIF.  Had Plaintiffs known of the falsity of Opus' representations, and the material facts that Opus wrongfully concealed, Plaintiffs would not have invested in DLIF.

147.    Opus' misrepresentations were material to Plaintiffs' decision to invest in DLIF. Had Plaintiffs known that Opus did not independently verify the underlying asset valuations of DLI Counterparties as well as the Funds' NAV based on the platform data that it received directly from Counterparties, Plaintiffs would not have invested in DLIF.

148.    Plaintiffs' reliance on Opus' materially false and intentionally misleading representations was a substantial factor in causing Plaintiffs' harm in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against the Opus as hereinafter set forth.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for trial by jury and respectfully request that the Court:

A.    Enter judgment in favor of Plaintiffs against Defendants on all Counts;

B.    Award Plaintiffs compensatory damages in an amount to be determined at trial and in excess of the minimum jurisdiction of this Court;

- 28 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1         C.      Award Plaintiffs cost of suit incurred herein, including reasonable attorneys' fees

2    as permitted by statute of other law;

3         D.      Award Plaintiffs punitive damages against Opus on Count III; and,

4         E.      Such other and further relied as the Court deems just and proper.

5

6    Dated:  April 27, 2020                     HOGE, FENTON, JONES & APPEL, INC.

7

8

9                                  By: _____

10                                      Eugene Ashley

                                   Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**EXHIBIT A**



Direct Lending Income Fund, LP

Financial Statements
with the Independent Auditors' Report

For the year ended December 31, 2016

# Direct Lending Income Fund, LP

## Table of Contents

Independent Auditors' Report                                              3

Statement of Assets, Liabilities and Partners' Capital                   5

Statement of Operations                                                  6

Statement of Changes in Partners' Capital                               7

Statement of Cash Flows                                                  8

Notes to Financial Statements                                           9

Audited financial statements of DLI Capital, Inc. and Subsidiaries, for the period from
October 1, 2016 through December 31, 2016



**Deloitte & Touche LLP**
555 Mission Street
Suite 1400
San Francisco, CA 94105
USA

Tel:+1 415 783 4000
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To Direct Lending Income Fund, LP:

We have audited the accompanying financial statements of Direct Lending Income Fund, LP (the "Partnership") which comprise the statement of assets, liabilities and partners' capital as of December 31, 2016, and the related statements of operations, changes in partners' capital, and cash flows for the year then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Partnership's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Direct Lending Income Fund, LP as of December 31, 2016, and the results of its operations, changes in its partners' capital, and its cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

April 26, 2017

**Direct Lending Income Fund, LP**
Statement of Assets, Liabilities and Partners' Capital
December 31, 2016

**Assets**

| | | |
|---|---|---:|
| Investment in DLI Capital, Inc. | $ | 152,726,363 |
| Note receivable from DLI Capital, Inc. | | 610,905,452 |
| Cash | | 31,820,985 |
| Interest receivable | | 5,998,473 |
| Dividend receivable | | 242,733 |
| **Total Assets** | | **801,694,006** |

**Liabilities**

| | |
|---|---:|
| Withdrawals payable | 19,994,124 |
| Distributions payable | 2,112,484 |
| Advance capital contributions | 27,249,223 |
| Withholding taxes payable | 819 |
| Due to DLI Capital, Inc. | 86,041 |
| **Total Liabilities** | **49,442,691** |

| | | |
|---|---|---:|
| **Partners' Capital** | $ | **752,251,315** |

**Direct Lending Income Fund, LP**
Statement of Operations
Year ended December 31, 2016

| | | |
|---|---|---:|
| **Investment Income:** | | |
| Interest income | $ | 67,966,524 |
| | | |
| **Investment income from Notes Receivable and Investment in** | | |
| **DLI Capital, Inc. (Note 1):** | | |
| Interest income | | 18,233,021 |
| Dividend income (net of withholding taxes of $15,908) | | 776,799 |
| Total investment income from DLI Capital, Inc. | | 19,009,820 |
| Total investment income | | 86,976,344 |
| | | |
| **Fund Expenses:** | | |
| Management fees | | 4,137,361 |
| Administration fees | | 223,343 |
| Professional fees | | 762,200 |
| Custody fees | | 149,095 |
| Legal fees | | 877,044 |
| Other expenses | | 111,977 |
| Total fund expenses | | 6,261,020 |
| Net investment income | | 80,715,324 |
| | | |
| **Net realized gain (loss) and unrealized appreciation (depreciation)** | | |
| **from investments:** | | |
| Net realized gain (loss) on investments | | (5,321,538) |
| Net change in unrealized appreciation (depreciation) on investments | | 1,777,130 |
| Net realized and unrealized gain (loss) from investments | | (3,544,408) |
| **Net increase in partners' capital resulting from operations** | $ | 77,170,916 |

# Direct Lending Income Fund, LP
## Statement of Changes in Partners' Capital
### Year ended December 31, 2016

| | General Partner | Limited Partners | Total |
|---|---|---|---|
| **Increase in partners' capital from operations:** | | | |
| Net investment income | $ 73,813 | $ 77,097,103 | $ 77,170,916 |
| **Distributions to limited partners** | - | (21,334,545) | (21,334,545) |
| **Performance allocation** | 10,374,102 | (10,374,102) | - |
| **Capital transactions:** | | | |
| Capital contributions | 1,482 | 493,397,558 | 493,399,040 |
| Capital withdrawals | (12,119,861) | (192,348,827) | (204,468,688) |
| Net increase (decrease) in partners' capital resulting from capital transactions | (12,118,379) | 301,048,731 | 288,930,352 |
| Net increase (decrease) in partners' capital | (1,670,464) | 346,437,187 | 344,766,723 |
| Partners' Capital, beginning of the year | 1,685,419 | 405,799,173 | 407,484,592 |
| **Partners' Capital, end of the year** | $ 14,955 | $ 752,236,360 | $ 752,251,315 |

**Direct Lending Income Fund, LP**
Statement of Cash Flows
Year ended December 31, 2016

**Cash flows from operating activities:**

| | | |
|---|---:|---:|
| Net increase in partners' capital from operations | $ | 77,170,916 |
| Adjustments to reconcile net increase in partners' capital from | | |
| operations to net cash used in operating activities: | | |
| Purchase of investments | | (621,022,035) |
| Proceeds from sales of investments and principal repayments | | 295,174,149 |
| Net realized loss from investments | | 5,321,538 |
| Net change in unrealized (appreciation) depreciation on investments | | (1,777,130) |
| Purchase of Investment in DLI Capital, Inc. | | (18,170,858) |
| Changes in operating assets and liabilities: | | |
| Increase in Note receivable from DLI Capital, Inc. | | (72,683,433) |
| Decrease in Due from Platforms | | 11,429,565 |
| Increase in Interest receivable | | (3,249,915) |
| Increase in Dividend receivable | | (242,733) |
| Decrease in Other assets | | 646,486 |
| Increase in Taxes payable | | 819 |
| Increase in Due to DLI Capital, Inc. | | 86,041 |
| Decrease in Payable to General Partner | | (445) |
| Decrease in Other liabilities | | (130,664) |
| Net cash used in operating activities | | (327,447,699) |

**Cash flows from financing activities:**

| | | |
|---|---:|---:|
| Proceeds from capital contributions | | 493,399,040 |
| Change in advance capital contributions | | (2,628,836) |
| Payments for capital withdrawals | | (181,294,742) |
| Change in withdrawals payable | | 17,922,822 |
| Change in distributions payable | | 968,598 |
| Net cash provided by financing activities | | 328,366,882 |

| | | |
|---|---:|---:|
| Net increase in cash | | 919,183 |
| Cash, beginning of year | | 30,901,802 |
| Cash, end of year | $ | 31,820,985 |

**Supplemental information and non-cash operating activities:**

| | | |
|---|---:|---:|
| Amounts paid for withholding taxes | $ | (15,089) |
| In-kind purchase of investment in DLI Capital, Inc. | | (134,555,505) |
| In-kind increase in note receivable from DLI Capital, Inc. | | (538,222,019) |

*Refer to accompanying notes to financial statements and consolidated financial statements of DLI Capital, Inc.*          8

**Direct Lending Income Fund, LP**
Notes to Financial Statements
December 31, 2016

**1. Organization and Basis of Presentation**

Direct Lending Income Fund, L.P. (the "Partnership"), a Delaware investment limited partnership, was organized on September 21, 2012 and commenced operations on November 1, 2012. The Partnership was organized to operate as a private investment partnership.

During the period of January 1, 2016 through September 31, 2016, the Partnership operated as a stand-alone, open-ended investment fund. On October 1, 2016, the Partnership invested into DLI Capital, Inc. (the "Master Fund") via a subscription in-kind, by assigning its investments and other assets into a subsidiary of the Master Fund in exchange for a combination of the Master Fund's debt and equity. The Master Fund is organized to invest directly or indirectly in short-term loans, lines of credit, receivables, other debt obligations and real estate loans. The consolidated financial statements of the Master Fund, including the consolidated condensed schedule of investments are attached to and should be read in conjunction with the Partnership's financial statements. The Partnership owned approximately 91.9% of the Master Fund at December 31, 2016.

Direct Lending Investments, LLC, a related party, serves as the general partner and investment manager (the "General Partner") of the Partnership. The General Partner is registered as an investment advisor with the Securities and Exchange Commission under the Investment Advisers Act of 1940.

Opus Fund Services (Bermuda) Ltd. serves as the Partnership's administrator providing administrative and record keeping services.

*Basis of Presentation*

The financial statements have been prepared in conformity with the accounting principles generally accepted in the United States of America ("GAAP"). The Partnership is an investment company and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 946. The financial statements have been presented in US Dollars.

**2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, including the fair value of investments, and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of income and expenses during the reporting period. Actual results could differ from those estimates and those differences could be material.

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**2.  Summary of Significant Accounting Policies (continued)**

*Cash*

Cash consists of cash at financial institutions. Cash includes $27.2 million of deposits representing advanced capital contributions held at Northbrook Bank & Trust in the custody of the Partnership's administrator, Opus Fund Services.

*Note Receivable*

Effective October 1, 2016, the Partnership entered into a loan and security agreement with the Master Fund, whereby the Partnership provides a revolving credit facility, collateralized by the assets of the Master Fund, up to $2,000,000,000. The facility earns interest at 12% annually of the daily principal balance outstanding, receivable monthly, in arrears. The maturity date of the facility of September 30, 2021, and the Note is due in full at that date.

The principal balance outstanding at December 31, 2016 is $610,905,452. For the period of October 1, 2016 through December 31, 2016, the Partnership earned $18,233,021 in interest income, of which $5,998,473 is receivable as of December 31, 2016.

*Dividend Income*

Dividend income is recognized on the ex-dividend date and comprises the Partnership's allocable portion of net earnings of the Master Fund. For the period of October 1, 2016 through December 31, 2016, the Partnership recognized $776,799 in dividends (net of withholding taxes) from the Master Fund, of which $242,733 is receivable at December 31, 2016.

*Valuation of Investment in DLI Capital, Inc.*

The Partnership records its investment in the Master Fund at its proportionate share of equity of the Master Fund. Valuation of investments held by the Master Fund, including, but not limited to, the valuation techniques used and categorization within the fair value hierarchy of investments, are discussed in the notes to the Master Fund's consolidated financial statements, included elsewhere in this report.

*Income Taxes*

No provision for Federal, state and local income taxes has been made in the accompanying financial statements, as individual partners are responsible for their proportionate share of the Partnership's taxable income. Interest, dividends and other income realized by the Partnership from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Tax laws are complex and subject to different interpretations by the taxpayer and taxing authorities. Significant judgment is required when evaluating tax positions and related uncertainties.  Future events such as changes in tax legislation could require a provision for income taxes and any such changes could

10

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**2.  Summary of Significant Accounting Policies (continued)**

significantly affect amounts reported in the statement of operations. The Partnership is subject to potential examination by taxing authorities in various jurisdictions. The open tax years under potential examination vary by jurisdiction. The Partnership recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the statement of operations. As of December 31, 2016, there was no impact to the financial statements relating to accounting for uncertainty in income taxes.

**3. Investment Valuations and Fair Value Measurements**

*Fair Value – Definition and Hierarchy*

In determining fair value, the Partnership uses GAAP, which establishes a hierarchy that prioritizes the inputs used to measure fair value. Debt and equity securities that are not publicly traded or whose market prices are not readily available are valued at fair value as determined in good faith by management. The fair values are developed based on the best information available in the circumstances, in the absence of an observable input.  Investments are categorized based on the lowest level of input significant to the fair value measurement, as follows:

> Level 1 – The valuation is based on unadjusted quoted prices in active markets for identical instruments.

> Level 2 – The valuation is based on observable inputs such as quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques for which all significant inputs are observable in the market.

> Level 3 – The valuation is based on unobservable data used when there is little or no market activity and reflects management's own assumptions about how market participants would price such assets.  Level 3 valuations are typically performed using pricing models, discounted cash flow or similar techniques.

Measurement of fair value using level 2 and level 3 inputs necessitates the use of estimates and assumptions that are inherently subjective, and the values determined by management as a result of using such inputs may differ significantly from the values that would have been used had observable quotations in an active market existed, and the differences could be material. The level of input used for valuing securities is not necessarily an indication of the risk associated with investing in those securities.

*Fair Value – Valuation Processes*

The General Partner is responsible for valuation policies and procedures and determining the fair value of the investments. Such procedures are designed to assure that the applicable valuation approach is appropriate and that values included in these financial statements that are based on unobservable inputs are reasonable.

*Refer to audited consolidated financial statements of DLI Capital, Inc., attached.*

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

The Managing Member of the General Partner oversees the valuation process, which includes consultation with internal valuation professionals and corroboration by third party valuation professionals on a quarterly basis. The Managing Member of the General Partner reviews decisions and recommendations made by internal valuation professionals, changes in fair value measurements and may, as considered appropriate, update fair value guidelines to reflect available information.

*Fair Value – Valuation Techniques and Inputs*

The fair value of debt securities, which includes platform notes and asset-backed facilities, is determined using an income approach. The income approach uses valuation techniques that measure the net present value of anticipated future economic benefits (i.e. net cash flows). The estimated net cash flows generally develop an estimate of future cash flows that are expected to occur over the life of the contract based on investment-specific historical performance rates and default rates, loan to value ratios for the facilities, and covenant compliance, including the timeliness of interest payments. The default rate presented is an annualized, average estimate developed with respect to the platform notes or the borrowing base for the asset backed facilities, based on borrowing base eligibility rules underlying each facility. Where a cash flow estimate is not used, other unobservable inputs may be available, including recent transaction information.

The fair value of equity investments in private companies is determined using the practical expedient described in ASC 820-10-35-59 - *Measuring the Fair Value of Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent)*. Management reviews source data for these positions, including monthly financial statements and collateral asset reports, as well as ownership interests owned by the Partnership. Management also inspects the quality and performance of the underlying assets on a regular basis to validate the asset value of those private companies.

*Fair Value Measurements*

The Partnership's investments are categorized as Level 3 investments. The following table provides a reconciliation of the beginning and ending balances for all investments for the year ended December 31, 2016:

| | |
|---|---:|
| **Beginning balance,** January 1, 2016 | $ 394,982,535 |
| Purchases [1] | 621,022,035 |
| Principal payments | (295,174,149) |
| Net realized loss on investments | (5,321,538) |
| Net change in unrealized appreciation on investments | 1,777,130 |
| Transferred to DLI Capital, Inc. | (717,286,013) |
| **Ending balance,** December 31, 2016 | $ – |
| | |
| Net change in unrealized gain on investments still held at December 31, 2016 | $ – |

(1)  Purchases include capitalized interest.

During the year ended December 31, 2016, there were no transfers between Levels 1, 2 or 3 of the fair value hierarchy.

12

*Refer to audited consolidated financial statements of DLI Capital, Inc., attached.*

**Direct Lending Income Fund, LP**
Notes to Financial Statements

### 4. Partnership Terms

*Contributions*

The minimum initial capital contribution by investors ("Limited Partners") to the Partnership is $250,000, subject to the General Partner's sole discretion to accept subscriptions for lesser amounts. The General Partner may, in its sole discretion, elect to temporarily or permanently suspend the offering of Interests. The General Partner may, in its sole discretion, reject any subscription request for any reason or no reason.

The Partnership may accept such amounts as of the first business day of any calendar month, or at such other times as the General Partner may permit.

Contributions received in advance of the effective date are recorded as advance capital contributions on the Statement of Partner's Capital. At December 31, 2016, advance capital contributions totaled $27,249,223.

*Withdrawals*

Limited Partners may generally request to withdraw all or a portion of the balance in their capital account as of the end of any calendar month (a "Withdrawal"), provided that the Partnership receives at least 35 days prior written notice of such withdrawal. There is no minimum duration or "lock-up" period for investments in the Partnership. The General Partner expects in normal circumstances that payments for Withdrawals will generally be made within 30 days of the effective withdrawal date (except to the extent of any unrealized side pocket investments); however, if sufficient cash is not available to accommodate all withdrawal requests, the General Partner will allocate a pro rata share of cash available for withdrawals, based on the relative net asset value of the capital accounts held by all limited partners requesting withdrawal, in each calendar month to each limited partner requesting a withdrawal until the request is paid in full. Withdrawals payable to Limited Partners at December 31, 2016 was $19,994,124.

*Distributions*

Limited Partners in the Partnership may elect to receive periodic monthly distributions equal to the amount of net profits allocated to the Limited Partner's Capital Account for the month. Limited Partners may make the election at the time they initially subscribe to invest in the Partnership and may change their election at any time, provided that any change to an election will only be given effect for a calendar month if it is received at least 20 days before the end of the month. The distributions will generally be paid within 30 days after the end of each calendar month. All periodic monthly distributions are subject to availability of cash to fund such distributions. The amount due to the Limited Partners for distributions as of December 31, 2016 amounts to $2,112,484.

*Refer to audited consolidated financial statements of DLI Capital, Inc., attached.*

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**5.  Allocation of Profit and Loss and Related Party Transactions**

At the end of each accounting period of the Partnership, any net profit or loss is allocated to the capital accounts of all Partners in proportion to their respective allocation percentages for such period. For this purpose, each accounting period shall end at the close of each month, at any other time a Partner makes an additional capital contribution or affects a withdrawal, and at such other times as the General Partner may determine.

During the period of January 1, 2016 through September 30, 2016, the General Partner earned monthly management fees equal to 0.0833% (1% per annum) of each Limited Partner's Capital Account, payable in advance. For that period, management fees incurred were $4,137,361.  Beginning October 1, 2016, management fees are incurred at the Master Fund, based on the Master Fund's equity invested allocable to each Limited Partner. Refer to the financial statements of DLI Capital, Inc. for further details.

During the period of January 1, 2016 through September 30, 2016, the General Partner earned a Performance Allocation in an amount equal to 20% of the excess of (i) the net profits (less any net losses) otherwise allocable for such month to the capital account of each Limited Partner over (ii) any balance remaining in such limited partner's cumulative loss account as of the beginning of such calendar month.  The General Partner has the right to reduce or waive management fees and performance allocation for any limited partner. The performance allocation totaled $10,374,102 for the period from January 1, 2016 to September 30, 2016.

Beginning October 1, 2016, the General Partner no longer received a performance allocation. Instead, a performance fee is incurred by DLI Capital, Inc., based on each Limited Partner's allocable net earnings before interest expense and taxes. Refer to the financial statements of DLI Capital, Inc. for further information. For the period from October 1, 2016 through December 31, 2016, the Master Fund incurred $1,251,592 in management fees and $3,019,046 in performance fees on behalf of the Partnership.

The General Partner may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive lower Management Fee rates or Performance Allocations/Fees. The General Partner is not required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor is the General Partner required to offer such additional and/or different terms or rights to any other Limited Partner. The General Partner may enter into any such agreement with any Limited Partner at any time in its sole discretion.

Members of the General Partner and affiliated persons and other related parties have individual limited partner capital accounts totaling approximately $6 million at December 31, 2016.

*Expense Limitation Agreement*

For the period of January 1, 2016 through September 30, 2016, the Partnership was subject to an expense limitation agreement, where by the General Partner would pay any expenses of the Partnership, other than Management Fees or Transaction Expenses, to the extent that such expenses

14

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**5.  Allocation of Profit and Loss and Related Party Transactions (continued)**

exceed 1% on an annual basis or 0.0833% per month, subject to a recoupment in future months. No amounts were subject to the expense limitation agreement for the period and the General Partner did not recoup any amounts during the period.

Effective October 1, 2016, the expense limitation agreement is in place for the Master Fund, instead of the Partnership. Refer to the financial statements of DLI Capital, Inc. for further information.

**6.  Indemnifications**

The Partnership enters into contracts in the ordinary course of business under which it agrees to indemnify counterparties from certain liabilities arising out of business that they conduct with the Partnership. The Partnership's maximum exposure under these arrangements is unknown. However, the Partnership has not had prior claims or losses pursuant to these contracts and expects the risk of loss to be remote.

**7.  Financial Highlights**

Financial highlights for the year ended December 31, 2016 are as follows:

| | | |
|---|---|---|
| *Total return* | | |
| Total return before performance allocation | 12.85 | % |
| Performance allocation to General Partner | (1.64) | |
| Total return after performance allocation to General Partner | 11.21 | |
| | | |
| *Ratios to average limited partners' capital* | | |
| Net investment income | 12.16 | % |
| | | |
| Expenses | 0.99 | |
| Reallocation to General Partner | 1.64 | |
| Expenses and reallocation to General Partner | 2.63 | |

An individual partner's performance may vary based on different financial arrangements such as management fee, performance allocation/fees and the timing of capital transactions.

Total return is computed based on the change in the Limited Partners' capital accounts taken as a whole during the period, adjusted for capital contributions and withdrawals.

**8.  Subsequent Events**

For the period from January 1, 2017 through April 26, 2017, the Partnership accepted capital contributions of approximately $134,746,000 inclusive of the contributions made in advance of $27,249,223 at December 31, 2016.

During the period January 1, 2017 through April 26, 2017, capital withdrawals by limited partners totaled $44,585,397 and distributions to limited partners totaled $7,858,300.

*Refer to audited consolidated financial statements of DLI Capital, Inc., attached.*

**Direct Lending Income Fund, LP**
Notes to Financial Statements

**8.  Subsequent Events (continued)**

Management has evaluated subsequent events through April 26, 2017, the date the financial statements were available to be issued. Management has determined that there are no other material events that would require adjustment to or disclosure in the Partnership's financial statements.

16

*Refer to audited consolidated financial statements of DLI Capital, Inc., attached.*



DLI Capital, Inc. and Subsidiaries

Consolidated Financial Statements
with the Independent Auditors' Report

For the period from October 1, 2016 (Commencement of Operations)
through December 31, 2016

**DLI Capital, Inc. and Subsidiaries**

Table of Contents

| | |
|---|---|
| Independent Auditors' report | 3 |
| Consolidated Statement of Assets and Liabilities | 5 |
| Consolidated Condensed Schedule of Investments | 6 |
| Consolidated Statement of Operations | 8 |
| Consolidated Statement of Changes in Net Assets | 9 |
| Consolidated Statement of Cash Flows | 10 |
| Notes to Consolidated Financial Statements | 11 |



**Deloitte & Touche LLP**
555 Mission Street
Suite 1400
San Francisco, CA 94105
USA

Tel:+1 415 783 4000
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To DLI Capital, Inc. and Subsidiaries:

We have audited the accompanying consolidated financial statements of the DLI Capital, Inc. and Subsidiaries (the "Company") which comprise the consolidated statement of assets and liabilities, including the consolidated condensed schedule of investments, as of December 31, 2016, and the related consolidated statements of operations, changes in net assets, and cash flows for the period from October 1, 2016 (commencement of operations) through December 31, 2016, and the related notes to the consolidated financial statements.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of DLI Capital, Inc. and Subsidiaries as of December 31, 2016, and the results of its operations, changes in its net assets, and its cash flows for the period from October 1, 2016 (commencement of operations) through December 31, 2016, in accordance with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

April 26, 2017

## DLI Capital, Inc. and Subsidiaries
Consolidated Statement of Assets and Liabilities
December 31, 2016

**Assets**

| | | |
|---|---|---|
| Investments at fair value (cost $ 810,613,247) | $ | 804,375,693 |
| Cash | | 14,193,313 |
| Due from Platforms | | 12,426,171 |
| Interest receivable | | 8,210,265 |
| Prepaid assets | | 780,018 |
| Other assets | | 86,041 |
| **Total Assets** | | **840,071,501** |

**Liabilities**

| | |
|---|---|
| Interest payable | 6,405,581 |
| Management fees payable | 19,663 |
| Performance fees payable | 1,618,755 |
| Loan servicing fees payable | 228,933 |
| Taxes payable | 520,659 |
| Dividends payable | 306,949 |
| Other liabilities | 547,822 |
| Debt | 664,338,511 |
| **Total Liabilities** | **673,986,873** |

Commitments and contingencies (Note 8)

| | | |
|---|---|---|
| **Net Assets** | $ | **166,084,628** |

**Analysis of Net Assets:**

| | | |
|---|---|---|
| Net capital paid in on shares of common stock | | 166,084,628 |
| Net Assets (equivalent to $10 per share based on | | |
| 16,608,462.80 shares of common stock outstanding) | $ | 166,084,628 |

# DLI Capital, Inc. and Subsidiaries
## Consolidated Condensed Schedule of Investments
December 31, 2016

| Investments, at fair value | Principal / Cost | Percentage of Net Assets | Fair Value |
|---|---|---|---|
| United States | | | |
| Debt Investments | | | |
| Asset-Backed Facilities | | | |
| Consumer debt | | | |
| CarePayment, LLC | $ 18,490,609 | 11.13 % | $ 18,490,609 |
| FundHero, LLC | 22,900,000 | 13.79 | 22,900,000 |
| | | | |
| Receivables | | | |
| Capstone Business Funding, LLC | 29,675,789 | 17.87 | 29,675,789 |
| Forward Financing SPV, LLC | 33,000,000 | 19.87 | 33,000,000 |
| | | | |
| Real estate | | | |
| DLI Properties, LLC | 192,500,000 | 115.90 | 192,500,000 |
| Indigo-DLI Holdings I, LLC | 8,743,038 | 5.26 | 8,743,038 |
| | | | |
| Telecommunications | | | |
| VoIP Guardian Partners I, LLC | 98,879,915 | 59.54 | 98,879,915 |
| Total Asset-Backed Facilities | 404,189,351 | 243.36 | 404,189,351 |
| | | | |
| Corporate loans and revolvers | | | |
| Finance | | | |
| LendingUSA, LLC | 19,966,477 | 12.02 | 19,966,477 |
| Other Corporate loans and revolvers | 18,188,891 | 10.96 | 18,188,891 |
| Total Corporate loans and revolvers | 38,155,368 | 22.98 | 38,155,368 |
| | | | |
| Small business loans [1] | | | |
| Finance | | | |
| QuarterSpot, Inc. | 123,308,617 | 73.67 | 122,347,560 |
| Dealstruck Holdings, Inc. | 62,749,019 | 35.63 | 59,175,913 |
| Other small business loans | 2,035,337 | 0.78 | 1,294,483 |
| Total small business loans | 188,092,973 | 110.08 | 182,817,956 |
| | | | |
| Real Estate loans [1] | | | |
| Real Estate | | | |
| BayPoint Capital Partners, LP | | | |
| Loan 20-1 | 11,533,872 | 6.94 | 11,533,872 |
| Other BayPoint Loans | 10,235,462 | 6.16 | 10,235,462 |
| Biz 2 Credit - Commercial Real Estate | 8,571,150 | 5.16 | 8,571,150 |
| Other real estate loans | 1,700,000 | 1.00 | 1,660,000 |
| Total Real Estate Loans | 32,040,484 | 19.26 | 32,000,484 |
| | | | |
| Receivables [1] | | | |
| Finance | | | |
| Biz 2 Credit, Inc. | 51,127,826 | 30.23 | 50,205,289 |
| Total Debt Investments | 713,606,002 | 425.91 | 707,368,448 |

*Refer to accompanying notes to financial statements.*

**DLI Capital, Inc. and Subsidiaries**
Consolidated Condensed Schedule of Investments
December 31, 2016

| Investments, at fair value (continued) | | Principal / Cost | Percentage of Net Assets | | | Fair Value |
|---|---|---|---|---|---|---|
| Equity Interests in Limited Liability Companies | | | | | | |
| Finance | | | | | | |
| CP Holdings 2, LLC | $ | 28,812,517 | 17.35 | % | $ | 28,812,517 |
| LCUSA Funding, LLC | | 63,502,552 | 38.24 | | | 63,502,552 |
| Other equity interests in limited liability companies | | 4,692,176 | 2.83 | | | 4,692,176 |
| Total Equity Investments | | 97,007,245 | 58.42 | | | 97,007,245 |
| Total Investments, at fair value | $ | 810,613,247 | 484.33 | % | $ | 804,375,693 |

Footnote (1): Unless otherwise identified, these investments represent a pool of loans or receivables originated by the counterparty listed, with none greater than 5% of Net Assets.

*Refer to accompanying notes to financial statements.*                                                                                        7

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Operations
For the period from October 1, 2016 (Commencement of Operations) through
December 31, 2016

**Investment Income:**

| | | |
|---|---|---:|
| Interest income | $ | 31,285,409 |
| Total investment income | | 31,285,409 |

**Expenses:**

| | |
|---|---:|
| Interest expense | 19,020,570 |
| Management fees | 1,973,897 |
| Performance fees | 4,322,731 |
| Administration fees | 106,919 |
| Custody fees | 115,000 |
| Professional fees | 221,427 |
| Legal fees | 90,375 |
| Other expenses | 180,464 |
| Total expenses | 26,031,383 |
| Management fees waived (Note 4) | (664,307) |
| Performance fees waived (Note 4) | (1,158,708) |
| Net expenses | 24,208,368 |
| Net investment income before provision for taxes | 7,077,041 |
| Withholding taxes | (32,117) |
| Income taxes | (488,871) |
| Net investment income after provision for taxes | 6,556,053 |

**Net realized gain (loss) and unrealized appreciation (depreciation) from investments:**

| | |
|---|---:|
| Net realized gain (loss) on investments | (9,368,981) |
| Net change in unrealized appreciation (depreciation) on investments | 3,688,711 |
| Net realized and unrealized gain (loss) from investments | (5,680,270) |
| **Net increase in net assets resulting from operations** | $ 875,783 |

*Refer to accompanying notes to financial statements.*

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Changes in Net Assets
For the period from October 1, 2016 (Commencement of Operations) through
December 31, 2016

| | | |
|---|---|---:|
| **Increase in net assets resulting from operations:** | | |
| Net investment income | $ | 6,556,053 |
| Net realized loss on investments | | (9,368,981) |
| Net change in unrealized appreciation (depreciation) on investments | | 3,688,711 |
| Net increase in net assets resulting from operations | | 875,783 |
| | | |
| **Dividends to shareholders from:** | | |
| Net increase in net assets resulting from operations | | (875,783) |
| | | |
| **Capital transactions:** | | |
| Issuance of common stock | | 166,084,628 |
| | | |
| Total increase in net assets | | 166,084,628 |
| | | |
| Net assets, beginning of period | | - |
| **Net Assets, end of period** | $ | 166,084,628 |
| | | |
| **Changes in Capital Shares** | | |
| Common stock, at beginning of period | | - |
| Issuance of common stock | | 16,608,462.80 |
| Common stock, at end of period | | 16,608,462.80 |

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Cash Flows
For the period from October 1, 2016 (Commencement of Operations) through
December 31, 2016

**Cash flows from operating activities:**

| | | |
|---|---|---|
| Net increase in net assets resulting from operations | $ | 875,783 |
| Adjustments to reconcile net increase in net assets resulting | | |
| from operations to net cash used in operating activities: | | |
| Purchases of investments | | (179,612,435) |
| Proceeds from sales of investments and principal repayments | | 86,842,485 |
| Net realized loss on investments | | 9,368,981 |
| Net change in unrealized (appreciation) depreciation on investments | | (3,688,711) |
| Changes in operating assets and liabilities: | | |
| Increase in Due from Platforms | | (12,426,171) |
| Increase in Interest receivable | | (8,210,265) |
| Increase in Prepaid assets | | (780,018) |
| Increase in Other assets | | (86,041) |
| Increase in Interest payable | | 6,405,581 |
| Increase in Management fees payable | | 19,663 |
| Increase in Performance fees payable | | 1,618,755 |
| Increase in Loan servicing fees payable | | 228,933 |
| Increase in Taxes payable | | 520,659 |
| Increase in Other liabilities | | 547,825 |
| Net cash used in operating activities | | (98,374,976) |

**Cash flows from financing activities:**

| | | |
|---|---|---|
| Proceeds from issuance of common stock | | 22,627,425 |
| Proceeds from borrowings on debt | | 90,509,699 |
| Dividends paid | | (568,835) |
| Net cash provided by financing activities | | 112,568,289 |

| | | |
|---|---|---|
| Net increase in cash | | 14,193,313 |
| Cash, beginning of period | | - |
| Cash, end of period | $ | 14,193,313 |

**Supplemental information and non-cash financing activities:**

| | | |
|---|---|---|
| Cash paid for interest expense | $ | (12,614,989) |
| Cash paid for income and withholding taxes | | (329) |
| In-kind issuance of common stock | | 143,457,203 |
| In-kind debt borrowings | | 573,828,812 |

*Refer to accompanying notes to financial statements.*                                    10

## DLI Capital, Inc. and Subsidiaries
Notes to Consolidated Financial Statements
For the period from October 1, 2016 (Commencement of Operations) to December 31, 2016

### 1. Organization and Basis of Presentation

DLI Capital, Inc. (the "Company"), a Nevada corporation, was organized on June 22, 2016 and commenced operations on October 1, 2016. The Company was organized through a master-feeder structure whereby the Company serves as the master fund and offers debt and equity to its two feeder funds, Direct Lending Income Fund, L.P. and Direct Lending Income Feeder Fund, Ltd. (collectively, the "Feeder Funds"). Effective October 1, 2016, the Feeder Funds each invested substantially all of their assets into the Company in exchange for a combination of debt and equity of the Company. This transaction included the pre-existing operations and assets of Direct Lending Income Fund, L.P.

The Company is managed by Direct Lending Investments, LLC (the "Advisor"), an investment advisor that is registered with the Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended. The Advisor directs and executes the investment operations of the Company.

On June 22, 2016, the Company formed DLI Capital Partner, Inc., a Nevada corporation ("Capital Partner") as a wholly-owned subsidiary. This subsidiary owns a 0.01% interest in DLI Assets Bravo, LLC. DLI Assets Bravo, LLC ("Bravo"), a Nevada limited liability company, was formed on September 15, 2016. The Company owns a 99.99% interest in Bravo. Bravo is the entity which owns the investment assets within the structure. The financial statements of these two entities are consolidated into the financial statements of the Company. All intercompany balances and transactions have been eliminated.

The objective of the Company is to generate current income through opportunistic investments, directly or indirectly, in loans ("Notes") to small- and medium-sized businesses, such as non-bank lenders (collectively referred to as "Platforms").

*Basis of Presentation*

The consolidated financial statements have been prepared in conformity with the accounting principles generally accepted in the United States of America ("GAAP"). The Company is an investment company and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 946. The financial statements have been presented in U.S. dollars.

### 2. Summary of Significant Accounting Policies

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, including the fair value of investments, and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of income and expenses during the reporting period. Actual results could differ from those estimates and those differences could be material.

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**2. Summary of Significant Accounting Policies (continued)**

*Cash*

Cash consists of cash at major financial institutions. Cash includes $11,686,965 held at Wells Fargo Bank, N.A. in the custody of the Company's custodian, Millennium Trust Company. Additional cash of $2,506,348 is held at Northbrook Bank & Trust in the custody of the Company's administrator, Opus Fund Services.

*Investments and related investment Income*

Interest income is accrued based upon the outstanding principal amount and contractual interest terms of debt investments. For investments with contractual payment-in-kind ("PIK") interest, which represents contractual interest accrued and added to the principal balance that generally becomes due at maturity, the Company will not accrue PIK interest if the investment valuation indicates that the PIK interest is not collectible. Interest income is presented net of servicing fees contractually incurred for servicing for Platform Notes. For equity investments in limited liability companies with preferred returns, which represents unrealized gains earned on the equity held, the Company will not accrue unrealized gains if the investment valuation indicates that the preferred return is not collectible.

Investments are recorded on the date of binding commitment on a trade-date basis. Realized gains or losses on investments are measured by the difference between the net proceeds from the disposition and the cost basis of the investment, without regard to unrealized gains or losses previously recognized. The Company reports current period changes in fair value of investments as a component of the net change in unrealized appreciation (depreciation) on investments in the consolidated statement of operations.

*Due from Platforms*

Due from Platforms represents net amounts receivable from Platforms in connection with the Company's purchase of Notes, collection of principal and interest on Notes, net of amounts due for payment of servicing and other transaction fees to each of the Platforms. Critical to the Company's operations is its reliance on the Platforms for the collection and servicing of the Notes purchased from the Platforms.

*Fair value of financial instruments*

The Company applies fair value to all of its financial instruments in accordance with ASC 820 - *Fair Value Measurement* ("ASC 820"). ASC 820 defines fair value, establishes a framework used to measure fair value and requires disclosures for fair value measurements. In accordance with ASC 820, the Company has categorized its financial instruments carried at fair value, based on the priority of the valuation technique, into a three-level fair value hierarchy. Fair value is a market-based measure considered from the perspective of the market participant who holds the financial instrument rather than an entity-specific measure. Therefore, when market assumptions are not readily available, the Company's own

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**2. Summary of Significant Accounting Policies (continued)**

assumptions are set to reflect those that management believes market participants would use in pricing the financial instrument at the measurement date.

The availability of observable inputs can vary depending on the financial instrument and is affected by a wide variety of factors, including, for example, the type of product, whether the product is new, whether the product is traded on an active exchange or in the secondary market and the current market conditions. To the extent that the valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by the Company in determining fair value is greatest for financial instruments classified as Level 3. See further description of fair value methodology in Note 3.

*Dividends*

Dividends to shareholders are recorded on the ex-dividend date. The amount paid is based upon earnings estimated by management, monthly.

**3. Investment Valuations and Fair Value Measurements**

*Fair Value – Definition and Hierarchy*

In determining fair value, the Company uses GAAP, which establishes a hierarchy that prioritizes the inputs used to measure fair value. Debt and equity securities that are not publicly traded or whose market prices are not readily available are valued at fair value as determined in good faith by management. The fair values are developed based on the best information available in the circumstances, in the absence of an observable input.  Investments are categorized based on the lowest level of input significant to the fair value measurement, as follows:

> Level 1 – The valuation is based on unadjusted quoted prices in active markets for identical instruments.

> Level 2 – The valuation is based on observable inputs such as quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques for which all significant inputs are observable in the market.

> Level 3 – The valuation is based on unobservable data used when there is little or no market activity and reflects management's own assumptions about how market participants would price such assets.  Level 3 valuations are typically performed using pricing models, discounted cash flow or similar techniques.

Measurement of fair value using level 2 and level 3 inputs necessitates the use of estimates and assumptions that are inherently subjective, and the values determined by management as a result of

13

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

using such inputs may differ significantly from the values that would have been used had observable quotations in an active market existed, and the differences could be material. The level of input used for valuing securities is not necessarily an indication of the risk associated with investing in those securities.

*Fair Value – Valuation Processes*

The Advisor is responsible for valuation policies and procedures and determining the fair value of the investments.   Such procedures are designed to assure that the applicable valuation approach is appropriate and that values included in these financial statements that are based on unobservable inputs are reasonable.

The Managing Member of the Advisor oversees the valuation process, which includes consultation with internal valuation professionals and corroboration by third party valuation professionals on a quarterly basis.  The Managing Member of the Advisor reviews decisions and recommendations made by internal valuation professionals, changes in fair value measurements and may, as considered appropriate, update fair value guidelines to reflect available information.

*Fair Value – Valuation Techniques and Inputs*

The fair value of debt securities, which includes Platform Notes and asset-backed facilities, is determined using an income approach.  The income approach uses valuation techniques that measure the net present value of anticipated future economic benefits (i.e. net cash flows).  The estimated net cash flows generally develop an estimate of future cash flows that are expected to occur over the life of the contract based on investment-specific historical performance rates and default rates, loan to value ratios for the facilities, and covenant compliance, including the timeliness of interest payments.  The default rate presented is an annualized, average estimate developed with respect to the Platform Notes or the borrowing base for the asset backed facilities, based on contractual borrowing base eligibility rules underlying each facility.  Where a cash flow estimate is not used, other unobservable inputs may be available, including recent transaction information.

The fair value of equity investments in limited liability companies is determined using the practical expedient described in ASC 820-10-35-59 - *Measuring the Fair Value of Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent)*.  These entities, classified as investment companies under ASC 946, own and manage a pool of collateral assets. Management reviews source data for these positions, including monthly financial statements and collateral asset reports, as well as ownership interests owned by the Company.  Management also inspects the quality and performance of the underlying assets on a regular basis to validate the asset value of those private companies.

14

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

*Fair Value Measurements*

The Company's investments are categorized as Level 3 investments. The following table provides a reconciliation of the beginning and ending balances for all investments from commencement of operations of the Company through December 31, 2016:

| | |
|---|---:|
| **Beginning balance,** October 1, 2016 | $ - |
| Transfer from Direct Lending Income Fund, L.P. | 717,286,013 |
| Purchases [1] | 179,612,435 |
| Principal payments | (86,842,485) |
| Net realized loss on investments | (9,368,981) |
| Net change in unrealized appreciation on investments | 3,688,711 |
| **Ending balance,** December 31, 2016 | $ 804,375,693 |
| | |
| Net change in unrealized gain on investments still held at December 31, 2016 | $ 3,688,711 |

(1)   Purchases include capitalized interest.

During the period from October 1, 2016 through December 31, 2016, there were no transfers between Levels 1, 2 or 3 of the fair value hierarchy.

The following table summarizes the valuation techniques and significant unobservable inputs used for the Company's investments at December 31, 2016:

| | Fair Value at December 31, 2016 | Valuation Technique | Significant Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| **Assets** | | | | |
| Debt Investments | $ 243,990,609 | Income approach | Default Rates [2] | 0% - 48.1% (6.65%) |
| | | | Loan to value ratio | 90.43% - 98.47% (97.85%) |
| | | | Effective Interest Rate | 16.20% - 18.67% (16.67%) |
| | 287,494,873 | Income approach | Default Rates [2] | 0% - 19.70% (7.38%) |
| | | | Effective Interest Rate [3] | 3.44% - 26.91% (18.61%) |
| | 175,882,966 | Recent transactions | Principal remaining | N/A |
| | $ 707,368,448 | | | |
| | | | | |
| Equity Investments in limited liability companies | 97,007,245 | Investments valued using at net asset value | | |
| | $ 804,375,693 | Total Investments in securities | | |

15

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

(2)   Default rates of underlying collateral assets are annualized and monitored based on contractual terms of the agreements.
(3)   Effective interest rate is net of servicing fees and unrealized appreciation (depreciation) and is annualized.

**4. Agreements and Related Party Transactions**

The Company considers the Advisor, its principal owners, members of management and entities under common control to be related parties to the Company.  Amounts due from and due to related parties are generally settled in the normal course of business.

*Investment Management Agreement*

On October 1, 2016, the Company entered into the Investment Management Agreement with the Advisor.   Under the terms of the Investment Management Agreement, the Advisor provides management services to the Company.  The management fee is calculated and payable monthly in advance at the annual rate of 1% of the Company's gross assets.

The Advisor also earns a performance fee each month, calculated as 20% monthly of the earnings before interest and taxes, including management fee, attributable to each series of common shares, to the extent that the net asset value of a series of shares of the Company exceeds the prior high net asset value of the series, as defined in the Investment Management Agreement.  If there is a net loss in any month, the performance fee will not apply to future periods until such net loss has been recovered.

The Advisor may enter into agreements to reduce or waive management fees and performance fee on the gross assets and earnings allocable to certain share classes of the Company and underlying investors in the Feeder Funds.

During the period from October 1, 2016 through December 31, 2016, the Company incurred $1,973,897 in management fees and $4,322,731 in performance fees.  Of these amounts, the Advisor voluntarily waived management fees of $664,307 and performance fees of $1,158,708.  At December 31, 2016, the Company owed the Advisor $19,663 of management fees and $1,618,755 of performance fees.

*Expense Limitation Agreement*

The Advisor has agreed to pay any expenses of the Company, other than management fees, performance fees or transaction expenses, to the extent that such expenses exceed 1% on an annual basis or 0.0833% per month.  To the extent the Advisor pays expenses of the Company pursuant to the preceding sentence, the Advisor may recoup the amount it pays on behalf of the Company by charging the Company 0.0833% per month for expenses in future months (even if the actual expenses for that month are less than 0.0833%) until the Advisor has recovered from the Company all expenses previously paid by the Advisor on the Company's behalf.  The Advisor may, at its sole discretion, modify or eliminate this expense limitation at any time, provided that the Advisor gives the Feeder Funds and their investors thirty (30) days advance notice before any change or elimination.  "Transaction Expenses"

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**4. Agreements and Related Party Transactions (continued)**

consist of all amounts paid by the Company (a) to effect the purchase or sale of a specific investment, including without limitation brokerage commissions, origination fees, servicing fees, clearing and settlement charges or professional fees, and (b) all amounts paid by the Company in connection with investments, including without limitation, interest, origination fees, points, or professional fees and (c) any taxes paid by the Company.  The Advisor has not paid any expenses on behalf of the Company and was not entitled to any recoupment amount under the expense limitation agreement for the period October 1, 2016 through December 31, 2016.

**5. Debt**

Effective October 1, 2016, the Company entered into loan and security agreements with each of its Feeder Funds, whereby the Feeder Funds each provide a revolving credit facility, collateralized by the assets of the Company, up to $2,000,000,000, which mature on September 30, 2021. The outstanding principal balances are due in full at the maturity date. The facilities bear interest at 12% annually of the daily principal balance outstanding, payable monthly, in arrears.

The principal balances outstanding at December 31, 2016 due to each of the Feeder Funds are $610,905,452 payable to Direct Lending Income Fund, L.P. and $53,433,059 payable to Direct Lending Income Feeder Fund, Ltd.

For the period of October 1, 2016 through December 31, 2016, the Company incurred $19,020,570 in interest expense related to the facilities, of which $6,405,581 is payable to the Feeder Funds at December 31, 2016.

**6. Stockholders' Equity**

On October 1, 2016, the Company entered into security purchase agreements with the Feeder Funds, providing for the private placement of the Company's common stock.  Under the terms of those security purchase agreements, the Feeder Funds agreed to transfer, assign and convey substantially all of their assets and liabilities to the Company, or a subsidiary of the Company, in exchange for note receivable in an amount equal to 80% of the net assets transferred and the Company's equity in an amount equal to 20% of the net assets transferred.

The Company has authorized and issued the following shares of common stock at December 31, 2016:

| Class of Shares | Authorized | Issued | Outstanding |
|---|---|---|---|
| Class D Common Stock, par value $0.001 per share | 500,000,000 | 15,272,636.30 | 15,272,636.30 |
| Class O Common Stock, par value $0.001 per share | 500,000,000 | 1,335,826.50 | 1,335,826.50 |
| Class S Common Stock, par value $0.001 per share | 500,000,000 | – | – |
| Total Shares Outstanding | | 16,608,462.80 | 16,608,462.80 |

17

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

### 6. Stockholders' Equity (continued)

The Company has adopted a Multi-Class Plan under which the Company has committed to maintaining a $10 per share purchase price by distributing earnings to stockholders monthly. During the period October 1, 2016 through December 31, 2016, the Company recorded $875,783 in dividends to the Feeder Funds. At December 31, 2016, the Company recorded $306,949 as dividends payable to the Feeder Funds.

### 7. Income Taxes

The Company recorded federal income tax expense of $488,871 (35 percent effective tax rate) for the period from October 1, 2016 (commencement of operations) through December 31, 2016. All dividends paid during the period from October 1, 2016 through December 31, 2016 were paid as qualified income distributions.

The Company records interest accrued and penalties related to unrecognized tax benefits in income tax expense.  As of December 31, 2016, the Company had not accrued any interest or penalties related to unrecognized tax benefits.

The Company recognizes the tax benefits of uncertain tax positions only when the position is more likely than not to be sustained, assuming examination by tax authorities. Management has analyzed the Company's tax positions and concluded that no liability for unrecognized tax benefits should be recorded related to uncertain tax positions expected to be taken on the Company's 2016 tax returns. The Company identifies its major tax jurisdictions as U.S. federal and Nevada State; however, the Company is not aware of any tax positions for which it is reasonably possible that the total amounts of unrecognized tax benefits will change materially in the next twelve months.

### 8. Commitments, Contingencies and Indemnifications

In the normal course of business, the Company enters into contracts which provide a variety of representations and warranties, and that provide general indemnifications. Such contracts include those with certain service providers and trading counterparties. Any exposure to the Company under these arrangements is unknown as it would involve future claims that may be made against the Company; however, based on the Company's experience, the risk of loss is remote and no such claims are expected to occur. As such, the Company has not accrued any liability in connection with such indemnifications.

## DLI Capital, Inc. and Subsidiaries
Notes to Consolidated Financial Statements

**9. Financial Highlights**

Below is the schedule of financial highlights of the Company for the period from October 1, 2016 (commencement of operations) through December 31, 2016. Financial highlights are calculated for each permanent, non-managing class of shares. An individual shareholder's financial highlights may vary based on different financial arrangements such as management fees, performance fees and the timing of capital transactions.

|  | Class D | Class O |
|---|---|---|
| **Per Share Data:** | | |
| Net asset value, beginning of period | $ 10.00 | $ 10.00 |
| Income from investment operations: | | |
| Net investment income (loss) | 0.40 | 0.57 |
| Net realized and unrealized gains (losses) on investments | (0.35) | (0.46) |
| Net increase in net assets resulting from operations | 0.05 | 0.11 |
| Less dividends | (0.05) | (0.11) |
| Total increase (decrease) in net assets | — | — |
| Net asset value, end of period | $ 10.00 | $ 10.00 |
| | | |
| Total Return [1] | 0.52% | 0.77% |
| Shares outstanding, end of period | 15,272,636.30 | 1,335,826.50 |
| | | |
| **Ratio to average net assets:** | | |
| Net investment Income [1] | 4.03% | 5.69% |
| | | |
| Operating expense [2] | 13.56% | 12.58% |
| Performance fee [3] | 1.99% | 1.88% |
| Total expenses | 15.55% | 14.46% |

(1)  Not annualized
(2)  Not annualized. During the period, the Advisor voluntarily waived a portion of its management fee (equal to 0.41% of average net assets for Class D shares, 0.50% for Class O shares).
(3)  Not annualized. During the period, the Advisor voluntarily waived a portion of its performance fee (equal to 0.72% of average net assets for class D shares, 0.90% for Class O shares).

**10. Subsequent Events**

For the period from January 1, 2017 through April 26, 2017, the Company paid $456,514 in dividends, inclusive of the $306,949 of dividends payable at December 31, 2016.

Management has evaluated subsequent events through April 26, 2017, the date the financial statements were available to be issued.  Management has determined that there are no other material events that would require adjustment to or disclosure in the Company's financial statements.

**EXHIBIT B**



Direct Lending Income Fund, L.P.

Financial Statements
with the Independent Auditors' Report

For the year ended December 31, 2017

# Direct Lending Income Fund, L.P.

Table of Contents

Independent Auditors' Report                                                        3

Statement of Assets, Liabilities and Partners' Capital                              5

Statement of Operations                                                             6

Statement of Changes in Partners' Capital                                           7

Statement of Cash Flows                                                             8

Notes to Financial Statements                                                       9

Audited financial statements of DLI Capital, Inc. and Subsidiaries, for the year ended
    December 31, 2017



**Deloitte & Touche LLP**
555 Mission Street
Suite 1400
San Francisco, CA 94105
USA

Tel:+1 415 783 4000
www.deloitte.com

**INDEPENDENT AUDITORS' REPORT**

To Direct Lending Income Fund, L.P.:

We have audited the accompanying financial statements of Direct Lending Income Fund, L.P. (the "Partnership") which comprise the statement of assets, liabilities and partners' capital as of December 31, 2017, and the related statements of operations, changes in partners' capital, and cash flows for the year then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Partnership's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Direct Lending Income Fund, L.P. as of December 31, 2017, and the results of its operations, changes in its partners' capital, and its cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Deloitte & Touche, LLP*

April 27, 2018

**Direct Lending Income Fund, L.P.**
Statement of Assets, Liabilities and Partners' Capital
As of December 31, 2017

**Assets**

| | | |
|---|---|---:|
| Investment in DLI Capital, Inc. | $ | 243,974,057 |
| Note receivable from DLI Capital, Inc. | | 435,858,138 |
| Cash | | 26,226,542 |
| Interest receivable | | 4,442,171 |
| Other assets | | 6,775 |
| **Total Assets** | | **710,507,683** |

**Liabilities**

| | |
|---|---:|
| Withdrawals payable | 27,933,115 |
| Distributions payable | 2,038,381 |
| Advance capital contributions | 21,556,001 |
| Due to DLI Capital, Inc. | 15,000 |
| Other liabilities | 8,263 |
| **Total Liabilities** | **51,550,760** |

| | | |
|---|---|---:|
| **Partners' Capital** | $ | **658,956,923** |

*Refer to accompanying notes to financial statements and consolidated financial statements of DLI Capital, Inc.*          5

# Direct Lending Income Fund, L.P.
## Statement of Operations
Year ended December 31, 2017

| | | |
|---|---|---:|
| **Investment Income:** | | |
| Interest income | $ | 72,525,188 |
| | | |
| **Fund Expenses:** | | |
| Fund administration fees | | 64,622 |
| Professional fees | | 139,926 |
| Custody fees | | 15,642 |
| Legal fees | | 2,321 |
| Other expenses | | 57,903 |
|    Total fund expenses | | 280,414 |
|       Net investment income | | 72,244,774 |
| | | |
| **Net unrealized appreciation (depreciation) from investment in DLI Capital, Inc.:** | | |
| Net change in unrealized appreciation (depreciation) from investment in DLI Capital, Inc. | | (2,253,742) |
| **Net increase in partners' capital resulting from operations** | $ | 69,991,032 |

**Direct Lending Income Fund, L.P.**
Statement of Changes in Partners' Capital
Year ended December 31, 2017

| | General Partner | Limited Partners | Total |
|---|---|---|---|
| **Increase in partners' capital from operations:** | | | |
| Net investment income | $ 1,379 | $ 72,243,395 | $ 72,244,774 |
| Net change in unrealized appreciation (depreciation) from investment in DLI Capital, Inc. | 269 | (2,254,011) | (2,253,742) |
| Net increase in partners' capital resulting from operations | 1,648 | 69,989,384 | 69,991,032 |
| **Distributions to limited partners** | – | (29,348,626) | (29,348,626) |
| **Capital transactions:** | | | |
| Capital contributions | – | 217,272,857 | 217,272,857 |
| Capital withdrawals | – | (351,209,655) | (351,209,655) |
| Net decrease in partners' capital resulting from capital transactions | – | (133,936,798) | (133,936,798) |
| Net increase (decrease) in partners' capital | 1,648 | (93,296,040) | (93,294,392) |
| Partners' Capital, beginning of the year | 14,955 | 752,236,360 | 752,251,315 |
| **Partners' Capital, end of the year** | $ 16,603 | $ 658,940,320 | $ 658,956,923 |

*Refer to accompanying notes to financial statements and consolidated financial statements of DLI Capital, Inc.*   7

# Direct Lending Income Fund, L.P.
## Statement of Cash Flows
### Year ended December 31, 2017

| | | |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Net increase in partners' capital from operations | $ | 69,991,032 |
| Adjustments to reconcile net increase in partners' capital from | | |
| operations to net cash used in operating activities: | | |
| Purchase of investments | | (171,544,196) |
| Proceeds from investments | | 78,042,760 |
| Net change in unrealized (appreciation) depreciation from investment in | | |
| DLI Capital, Inc. | | 2,253,742 |
| Changes in operating assets and liabilities: | | |
| Decrease in Note receivable from DLI Capital, Inc. | | 175,047,314 |
| Decrease in Interest receivable | | 1,556,302 |
| Decrease in Dividend receivable | | 242,733 |
| Increase in Other assets | | (6,775) |
| Decrease in Taxes payable | | (819) |
| Decrease in Due to DLI Capital, Inc. | | (71,041) |
| Increase in Other liabilities | | 8,263 |
| Net cash provided by operating activities | | 155,519,315 |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from capital contributions | | 217,272,857 |
| Change in advance capital contributions | | (5,693,222) |
| Payments for capital withdrawals | | (351,209,655) |
| Change in withdrawals payable | | 7,938,991 |
| Payments for distributions | | (29,348,626) |
| Change in distributions payable | | (74,103) |
| Net cash used in financing activities | | (161,113,758) |
| | | |
| Net decrease in cash | | (5,594,443) |
| Cash, beginning of the year | | 31,820,985 |
| Cash, end of the year | $ | 26,226,542 |
| | | |
| **Supplemental information:** | | |
| Cash paid for withholding taxes | $ | (998) |

## Direct Lending Income Fund, L.P.
Notes to Financial Statements
Year ended December 31, 2017

**1.  Organization and Basis of Presentation**

Direct Lending Income Fund, L.P. (the "Partnership"), a Delaware investment limited partnership, was organized on September 21, 2012 and commenced operations on November 1, 2012. The Partnership was organized to operate as a private investment partnership.

On October 1, 2016, the Partnership invested into DLI Capital, Inc. (the "Master Fund") via a subscription in-kind, by assigning its investments and other assets into a subsidiary of the Master Fund in exchange for a combination of the Master Fund's debt and equity. The Master Fund is organized to invest directly or indirectly in collateral assets, which may include short-term loans, lines of credit, receivables, real estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer and small business loans and other tangible and intangible assets. The consolidated financial statements of the Master Fund, including the consolidated condensed schedule of investments are attached to and should be read in conjunction with the Partnership's financial statements. The Partnership owned approximately 76.8% of the Master Fund at December 31, 2017.

Direct Lending Investments, LLC, a related party, serves as the general partner and investment manager (the "General Partner") of the Partnership. The General Partner is registered as an investment advisor with the Securities and Exchange Commission under the Investment Advisers Act of 1940.

Opus Fund Services (Bermuda) Ltd. serves as the Partnership's administrator providing administrative and record keeping services.

*Basis of Presentation*

The financial statements have been prepared in conformity with the accounting principles generally accepted in the United States of America ("GAAP"). The Partnership is an investment company and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 946. The financial statements have been presented in U.S. Dollars.

**2.  Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, including the fair value of investments, and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of income and expenses during the reporting period. Actual results could differ from those estimates and those differences could be material.

**Direct Lending Income Fund, L.P.**
Notes to Financial Statements

**2.   Summary of Significant Accounting Policies (continued)**

*Cash*

Cash consists of cash at financial institutions. Cash includes $21.6 million of deposits representing advanced capital contributions held at Northbrook Bank & Trust in the custody of the Partnership's administrator, Opus Fund Services.

*Note Receivable*

Effective October 1, 2016, the Partnership entered into a loan and security agreement with the Master Fund, whereby the Partnership provides a revolving credit facility, collateralized by the assets of the Master Fund, up to $2,000,000,000. The facility earns interest at 12% annually of the principal balance outstanding, receivable monthly, in arrears. The facility matures on September 30, 2021, and all obligations due on the note are due in full on that date.

The principal balance outstanding at December 31, 2017 is $435,858,138. For the year ended December 31, 2017, the Partnership earned $72,525,188 in interest income, of which $4,442,171 is receivable as of December 31, 2017.

*Income from Equity*

The Partnership owns equity shares issued by the Master Fund, and thus is eligible to receive dividends from net income, when declared by the Master Fund. Dividend income is recognized on the ex-dividend date and comprises the Partnership's allocable portion of net earnings of the Master Fund. No dividend income was earned from the Master Fund for the year ended December 31, 2017.

To the extent that the Master Fund records a net loss in a tax period, the Master Fund records a reverse stock split to reduce the shares owned by the Partnership such that the net asset value per share is equal to $10. The Partnership records a change in unrealized depreciation equal to its proportion of the net loss recorded by the Master Fund. For the year ended December 31, 2017, the Partnership recorded a change in unrealized depreciation of $2,253,742.

*Valuation of Investment in DLI Capital, Inc.*

The Partnership records its investment in the Master Fund at its proportionate share of equity of the Master Fund. Valuation of investments held by the Master Fund, including, but not limited to, the valuation techniques used and categorization within the fair value hierarchy of investments, are discussed in the notes to the Master Fund's consolidated financial statements, included elsewhere in this report.

*Income Taxes*

The Partnership does not record a provision for US federal, US state, or local income taxes because the partners report their share of the Fund's income or loss on their income tax returns. However, certain dividend income may be subject to a maximum 30% withholding tax for limited partners that are foreign

**Direct Lending Income Fund, L.P.**
Notes to Financial Statements

**2. Summary of Significant Accounting Policies (continued)**

entities or foreign individuals. Tax laws are complex and subject to different interpretations by the taxpayer and taxing authorities.  Significant judgment is required when evaluating tax positions and related uncertainties.  The Partnership files an income tax return in the US federal jurisdiction, as well as in various US states. Future events such as changes in tax legislation could require a provision for income taxes and any such changes could significantly affect amounts reported in the statement of operations.

The Partnership is subject to potential examination by taxing authorities in various jurisdictions. The open tax years under potential examination vary by jurisdiction.

The Partnership is required to determine whether its tax positions are "more-likely-than-not" to be sustained upon examination by the applicable taxing authority, based on the technical merits of the position. Tax positions not deemed to meet a "more-likely-than-not" threshold would be recorded as a tax expense in the current year. As of December 31, 2017, there was no impact to the financial statements relating to accounting for uncertainty in income taxes.

**3. Partnership Terms**

*Contributions*

The minimum initial capital contribution by investors ("Limited Partners") to the Partnership is $250,000, subject to the General Partner's sole discretion to accept subscriptions for lesser amounts. The General Partner may elect to temporarily or permanently suspend the offering of Partnership interests. Additionally, the General Partner may reject any subscription request for any reason or no reason. The Partnership may accept such amounts as of the first business day of any calendar month, or at such other times as the General Partner may permit.

Contributions received in advance of the effective date are recorded as advance capital contributions on the Statement of Partner's Capital. At December 31, 2017, advance capital contributions totaled $21.6 million.

*Withdrawals*

Limited Partners may generally request to withdraw all or a portion of the balance in their capital account as of the end of any calendar month (a "Withdrawal"), provided that the Partnership receives at least 35 days prior written notice of such withdrawal. There is no minimum duration or "lock-up" period for investments in the Partnership. The General Partner expects in normal circumstances that payments for Withdrawals will generally be paid within 30 days of the effective withdrawal date (except to the extent of any unrealized side pocket investments); however, if sufficient cash is not available to accommodate all withdrawal requests, the General Partner will allocate a pro rata share of cash available for withdrawals, based on the relative net asset value of the capital accounts held by all limited partners requesting withdrawal, in each calendar month to each limited partner requesting a withdrawal until the request is paid in full. Withdrawals payable to Limited Partners at December 31, 2017 was $27.9 million.

**Direct Lending Income Fund, L.P.**
Notes to Financial Statements

**3. Partnership Terms (continued)**

*Distributions*

Limited Partners in the Partnership may elect to receive periodic monthly distributions equal to the amount of net profits allocated to the Limited Partner's Capital Account for the month. Limited Partners may make the election at the time they initially subscribe to invest in the Partnership and may change their election at any time, provided that any change to an election will only be given effect for a calendar month if it is received at least 20 days before the end of the month. The distributions will generally be paid within 30 days after the end of each calendar month. All periodic monthly distributions are subject to availability of cash to fund such distributions. The amount due to the Limited Partners for distributions as of December 31, 2017 was $2 million.

**4.  Allocation of Profit and Loss and Related Party Transactions**

At the end of each month, any net profit or loss is allocated to the capital accounts of all Partners in proportion to their respective ownership of the debt and equity of the Master Fund. Expenses incurred by the Partnership are generally allocated based on each Partner's proportionate ownership of the Partnership.

The Master Fund pays the General Partner a management fee calculated and payable each month in advance, to be paid at an annual rate of 1% of the Master Fund's gross assets attributable to the Partnership, as described in the financial statements of the Master Fund, which are an integral part of these financial statements.

The Master Fund pays the General Partner a performance fee, payable on a monthly basis, which is generally equal to 20% of allocated earnings before interest and taxes, on behalf of each limited partner of the Partnership, when the limited partner's net asset value exceeds the prior high net asset value.

For the year ended December 31, 2017, the Master Fund incurred $7,506,165 in management fees, net of $527,645 of management fees waived by the General Partner, and $16,224,741 in performance fees on behalf of the Partnership.

The General Partner may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive lower Management fee rates or Performance fees. The General Partner is not required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor is the General Partner required to offer such additional and/or different terms or rights to any other Limited Partner. The General Partner may enter into any such agreement with any Limited Partner at any time in its sole discretion.

Members of the General Partner and affiliated persons and other related parties have individual limited partner capital accounts totaling approximately $3.6 million at December 31, 2017.

**Direct Lending Income Fund, L.P.**
Notes to Financial Statements

**5.  Commitments, Contingencies and Indemnifications**

In the normal course of business, the Partnership enters into contracts with third parties, including without limitation certain service providers, which incorporate a variety of representations, warranties, and general indemnification obligations. Any exposure to the Partnership under these arrangements is unknown as it would involve future claims that may be made against the Partnership; however, based on the Partnership's historical experience, the risk of loss is remote. As such, the Partnership has not accrued any liability in connection with such contingent obligations.

**6.  Financial Highlights**

Financial highlights for the year ended December 31, 2017 are as follows:

| | | |
|---|---|---|
| Total return | 8.92 | % |
| | | |
| *Ratios to average limited partners' capital:* | | |
| Net investment income | 8.77 | % |
| Expenses (including the Partnership's proportionate share of expenses from the Master Fund[1]) | 0.67 | |

[1] During the year, the General Partner voluntarily waived a portion of its management fee, representing an amount equal to 0.06% of the Partnership's proportionate share of expenses from the Master Fund as a ratio to the Partnership's average limited partners' capital.

An individual partner's performance may vary based on different financial arrangements such as management fee, performance allocation/fees and the timing of capital transactions.

Total return is computed based on the change in the Limited Partners' capital accounts taken as a whole during the period, adjusted for capital contributions and withdrawals.

**7.  Subsequent Events**

For the period from January 1, 2018 through April 27, 2018, the Partnership accepted capital contributions of approximately $71.2 million inclusive of the contributions made in advance of $21.6 million at December 31, 2017. During the period January 1, 2018 through April 27, 2018, capital withdrawals by limited partners and distributions to limited partners totaled $108.7 million.

Management has evaluated subsequent events through April 27, 2018, the date the financial statements were available to be issued. Management has determined that there are no other material events that would require adjustment to or disclosure in the Partnership's financial statements.



DLI Capital, Inc. and Subsidiaries

Consolidated Financial Statements
with the Independent Auditors' Report

For the year ended December 31, 2017

**DLI Capital, Inc. and Subsidiaries**

Table of Contents

Independent Auditors' Report                                            3

Consolidated Statement of Assets and Liabilities                       5

Consolidated Condensed Schedule of Investments                         6

Consolidated Statement of Operations                                   8

Consolidated Statement of Changes in Net Assets                        9

Consolidated Statement of Cash Flows                                  10

Notes to Consolidated Financial Statements                            11



**Deloitte & Touche LLP**
555 Mission Street
Suite 1400
San Francisco, CA 94105
USA

Tel:+1 415 783 4000
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To DLI Capital, Inc. and Subsidiaries:

We have audited the accompanying consolidated financial statements of the DLI Capital, Inc. and Subsidiaries (the "Company") which comprise the consolidated statement of assets and liabilities, including the consolidated condensed schedule of investments, as of December 31, 2017, and the related consolidated statements of operations, changes in net assets, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of DLI Capital, Inc. and Subsidiaries as of December 31, 2017, and the results of its operations, changes in its net assets, and its cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Deloitte & Touche, LLP*

April 27, 2018

### DLI Capital, Inc. and Subsidiaries
### Consolidated Statement of Assets and Liabilities
As of December 31, 2017

**Assets**

| | | |
|---|---|---:|
| Investments at fair value (cost $817,698,737) | $ | 819,274,968 |
| Cash | | 52,862,636 |
| Due from counterparties, net | | 9,003,715 |
| Interest receivable | | 11,377,164 |
| Prepaid assets | | 251,577 |
| Due from Feeder Funds | | 30,000 |
| Taxes receivable | | 774,586 |
| Deferred tax asset | | 199,468 |
| **Total Assets** | | **893,774,114** |

**Liabilities**

| | | |
|---|---|---:|
| Interest payable | | 5,785,306 |
| Management fees payable | | 81,395 |
| Performance fees payable | | 1,404,281 |
| Legal fees payable | | 504,541 |
| Other liabilities | | 740,955 |
| Debt | | 567,644,223 |
| **Total Liabilities** | | **576,160,701** |

Commitments and contingencies (Note 8)

| | | |
|---|---|---:|
| **Net Assets** | $ | **317,613,413** |

**DLI Capital, Inc. and Subsidiaries**
Consolidated Condensed Schedule of Investments
As of December 31, 2017

| Investments, at fair value[1] | Principal / Cost | Percentage of Net Assets | | Fair Value |
|---|---|---|---|---|
| Debt investments | | | | |
| Asset-backed facilities | | | | |
| Auto warranty finance | | | | |
| Origin SPE, LLC, due May 2022 | $ 31,482,823 | 9.9 | % $ | 31,482,823 |
| | | | | |
| Financials | | | | |
| Capstone Business Funding, LLC, due Aug. 2020 | 49,558,098 | 15.6 | | 49,558,098 |
| Kountable Borrower, LLC, due Jan. 2022 | 2,049,309 | 0.7 | | 2,049,309 |
| Liftforward SPV III, LLC, due May 2022 | 24,552,000 | 7.7 | | 24,552,000 |
| Total Financials | 76,159,407 | 24.0 | | 76,159,407 |
| | | | | |
| Intangible assets | | | | |
| Global Innovation Aggregators, LLC, due May 2022 | 34,010,000 | 10.7 | | 34,010,000 |
| | | | | |
| Real estate | | | | |
| DLI Properties, LLC, due Jul. 2020 | 47,039,104 | 14.8 | | 47,039,104 |
| Indigo-DLI Holdings I, LLC, due Dec. 2021 | 25,636,228 | 8.1 | | 25,636,228 |
| Liberty Fund, LLC, due May 2021 | 58,460,109 | 18.4 | | 58,460,109 |
| Total Real estate | 131,135,441 | 41.3 | | 131,135,441 |
| | | | | |
| Telecommunications | | | | |
| VoIP Guardian Partners I, LLC, due Sept. 2020 | 180,396,984 | 56.8 | | 180,396,984 |
| Total Asset-backed facilities | 453,184,655 | 142.7 | | 453,184,655 |
| | | | | |
| Corporate term loans | | | | |
| Financials | | | | |
| FPP Sandbox, LLC - InMobi, due Jun. 2018 | 4,000,000 | 1.3 | | 4,000,000 |
| LendingUSA, LLC, due Dec. 2019 | 28,594,584 | 9.0 | | 28,594,584 |
| Total Financials | 32,594,584 | 10.3 | | 32,594,584 |
| | | | | |
| Other | | | | |
| Morrison Oil, LLC, due Jun. 2019 | 2,999,680 | 0.9 | | 2,999,680 |
| The Mane Choice Hair Solution LLC, due Aug. 2019 | 2,120,000 | 0.7 | | 2,120,000 |
| Walsh Electrical Contracting Inc., due Oct. 2018 | 9,547,617 | 1.9 | | 6,176,917 |
| Total Other | 14,667,297 | 3.5 | | 11,296,597 |
| Total Corporate term loans | 47,261,881 | 13.8 | | 43,891,181 |
| | | | | |
| Whole loans [2] | | | | |
| Small business | | | | |
| Dealstruck Funding 3, LLC | 24,541,791 | 5.5 | | 17,313,963 |
| QuarterSpot, Inc. | 56,223,450 | 15.8 | | 50,014,245 |
| Consumer | | | | |
| LoanHero, LLC | 36,495,922 | 10.7 | | 34,039,017 |
| Total Whole loans | 117,261,163 | 32.0 | | 101,367,225 |

*Refer to accompanying notes to consolidated financial statements.*

6

# DLI Capital, Inc. and Subsidiaries
## Consolidated Condensed Schedule of Investments
### As of December 31, 2017

| Investments, at fair value[1] (continued) | Principal / Cost | | Percentage of Net Assets | | Fair Value | |
|---|---|---|---|---|---|---|
| Real estate loans [2] | | | | | | |
| BayPoint Capital Partners, LP | $ | 27,731,266 | 8.7 | % | $ | 27,731,266 |
| Biz2credit, Inc. - Commercial Real Estate | | 1,400,000 | 0.4 | | | 1,400,000 |
| Realty Mogul, Co. | | 1,345,000 | 0.4 | | | 1,305,000 |
| Total Real estate loans | | 30,476,266 | 9.5 | | | 30,436,266 |
| | | | | | | |
| Receivables [2] | | | | | | |
| Financials | | | | | | |
| Biz2credit, Inc. | | 22,892,588 | 6.0 | | | 19,070,254 |
| Total Debt investments | | 671,076,553 | 204.0 | | | 647,949,581 |
| | | | | | | |
| Equity interests in limited liability companies | | | | | | |
| Consumer financials | | | | | | |
| LCUSA Funding, LLC | | 138,000,000 | 51.3 | | | 162,813,781 |
| | | | | | | |
| Real estate | | | | | | |
| OLP-Sequoia Funding SPV1, LLC | | 8,622,184 | 2.7 | | | 8,511,606 |
| Total Equity interests in limited liability companies | | 146,622,184 | 54.0 | | | 171,325,387 |
| Total Investments, at fair value | $ | 817,698,737 | 258.0 | % | $ | 819,274,968 |

Footnotes

(1): All investments are in the United States.

(2): These positions reflect a financing arrangement whereby the Company acquires from its Counterparty interest in loans or other obligations originated by such Counterparty, where said Counterparty generally does not bear meaningful balance sheet exposure for the loans or other obligations it originates. The investment is comprised of a pool of Collateral Assets, with none greater than 5% of Net Assets.

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Operations
Year ended December 31, 2017

| | | |
|---|---|---:|
| **Investment Income:** | | |
| Interest income | $ | 133,267,871 |
| | | |
| **Expenses:** | | |
| Interest expense | | 85,040,864 |
| Management fees | | 9,360,175 |
| Performance fees | | 19,232,510 |
| Legal fees | | 1,694,173 |
| Professional fees | | 1,211,244 |
| Due diligence and deal expenses | | 1,103,243 |
| Custody fees | | 438,961 |
| Fund administration fees | | 391,765 |
| Other expenses | | 857,667 |
|    Total expenses | | 119,330,602 |
| Management fees waived (Note 4) | | (592,788) |
|    Net expenses | | 118,737,814 |
|      Net investment income before provision for taxes | | 14,530,057 |
| Net tax benefit | | 684,566 |
|      Net investment income after provision for taxes | | 15,214,623 |
| | | |
| **Net realized gain (loss) and unrealized appreciation (depreciation) from investments:** | | |
| Net realized gain (loss) from investments | | (19,443,647) |
| Net change in unrealized appreciation (depreciation) from investments | | 1,627,207 |
|    Net realized and unrealized loss from investments | | (17,816,440) |
|      **Net decrease in net assets resulting from operations** | $ | (2,601,817) |

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Changes in Net Assets
Year ended December 31, 2017

| | | |
|---|---|---:|
| **Increase (decrease) in net assets resulting from operations:** | | |
| Net investment income | $ | 15,214,623 |
| Net realized loss from investments | | (19,443,647) |
| Net change in unrealized appreciation (depreciation) from investments | | 1,627,207 |
| Net decrease in net assets resulting from operations | | (2,601,817) |
| | | |
| **Capital transactions:** | | |
| Issuance of common stock | | 241,416,064 |
| Redemptions and cancellations of common stock | | (87,285,462) |
| Net increase in net assets resulting from capital transactions | | 154,130,602 |
| | | |
| Total increase in net assets | | 151,528,785 |
| Net assets, beginning of the year | | 166,084,628 |
| **Net assets, end of the year** | $ | 317,613,413 |
| | | |
| **Changes in Capital Shares** | | |
| Common stock, beginning of the year | | 16,608,463 |
| Issuance of common stock | | 24,141,606 |
| Redemptions and cancellations of common stock | | (8,988,728) |
| Common stock, end of the year | | 31,761,341 |

*Refer to accompanying notes to consolidated financial statements.*

**DLI Capital, Inc. and Subsidiaries**
Consolidated Statement of Cash Flows
Year ended December 31, 2017

**Cash flows from operating activities:**

| | | |
|---|---|---:|
| Net decrease in net assets resulting from operations | $ | (2,601,817) |
| Adjustments to reconcile net decrease in net assets resulting | | |
| from operations to net cash used in operating activities: | | |
| Purchases of investments | | (734,472,413) |
| Proceeds from sales of investments and principal repayments | | 701,756,698 |
| Net realized loss from investments | | 19,443,647 |
| Net change in unrealized (appreciation) depreciation from investments | | (1,627,207) |
| Changes in operating assets and liabilities: | | |
| Decrease in Due from Counterparties | | 3,422,456 |
| Increase in Interest receivable | | (3,166,899) |
| Decrease in Prepaid assets | | 528,441 |
| Increase in Due from Feeder Funds | | (30,000) |
| Increase in Taxes receivable | | (774,586) |
| Increase in Deferred tax assets | | (199,468) |
| Decrease in Other assets | | 86,041 |
| Decrease in Interest payable | | (620,275) |
| Increase in Management fees payable | | 61,732 |
| Decrease in Performance fees payable | | (214,474) |
| Decrease in Loan servicing fees payable | | (228,933) |
| Increase in Legal fees payable | | 504,541 |
| Decrease in Taxes payable | | (520,659) |
| Increase in Other liabilities | | 193,133 |
| Net cash used in operating activities | | (18,460,042) |

**Cash flows from financing activities:**

| | | |
|---|---|---:|
| Proceeds from issuance of common stock | | 241,416,064 |
| Repayments from redemption of common stock | | (87,285,462) |
| Dividends paid | | (306,949) |
| Proceeds from borrowings on debt | | 300,794,460 |
| Repayments of borrowings on debt | | (397,488,748) |
| Net cash provided by financing activities | | 57,129,365 |
| Net increase in cash | | 38,669,323 |
| Cash, beginning of the year | | 14,193,313 |
| Cash, end of the year | $ | 52,862,636 |

**Supplemental information and non-cash financing activities:**

| | | |
|---|---|---:|
| Cash paid for interest expense | $ | (85,661,139) |
| Cash paid for income and withholding taxes | | (227,233) |
| Non-cash issuance of common stock | | 19,330,000 |
| Non-cash debt repayments | | (19,330,000) |

*Refer to accompanying notes to consolidated financial statements.*                    10

## DLI Capital, Inc. and Subsidiaries
### Notes to Consolidated Financial Statements
Year ended December 31, 2017

**1. Organization and Basis of Presentation**

DLI Capital, Inc. (the "Company"), a Nevada corporation, was organized on June 22, 2016 and commenced operations on October 1, 2016. The Company was organized through a master-feeder structure whereby the Company serves as the master fund and offers debt and equity to its two feeder funds, Direct Lending Income Fund, L.P. and Direct Lending Income Feeder Fund, Ltd. (collectively, the "Feeder Funds"). Effective October 1, 2016, the Feeder Funds each invested substantially all of their assets into the Company in exchange for a combination of debt and equity of the Company. This transaction included the pre-existing operations and assets of Direct Lending Income Fund, L.P.

The Company is managed by Direct Lending Investments, LLC (the "Advisor"), an investment advisor that is registered with the Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended. The Advisor directs and executes the investment operations of the Company.

On June 22, 2016, the Company formed DLI Capital Partner, Inc., a Nevada corporation ("Capital Partner") as a wholly-owned subsidiary. This subsidiary owns a 0.01% interest in each of DLI Assets, LLC and DLI Assets Bravo, LLC. DLI Assets, LLC ("Assets"), a Nevada limited liability company, was formed on June 10, 2016. DLI Assets Bravo, LLC ("Bravo"), a Nevada limited liability company, was formed on September 15, 2016. The Company owns a 99.99% interest in each of the entities, Assets and Bravo. Assets and Bravo own the investment assets within the structure. The financial statements of Capital Partner, Assets and Bravo are consolidated into the financial statements of the Company. All intercompany balances and transactions have been eliminated.

The objective of the Company is to generate current income through opportunistic investments across the credit markets, including without limitation through investments in counterparties holding or originating collateral assets (hereafter, the "Counterparties", and each a "Counterparty"). Such collateral assets may include short-term loans, lines of credit, receivables, real estate loans, portfolios of loans, intellectual property interests, real estate assets, consumer and small business loans and other tangible and intangible assets (hereafter, the "Collateral Assets").

*Basis of Presentation*

The consolidated financial statements have been prepared in conformity with the accounting principles generally accepted in the United States of America ("GAAP"). The Company is an investment company and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 946. The consolidated financial statements have been presented in U.S. Dollars.

11

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, including the fair value of investments, and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of income and expenses during the reporting period. Actual results could differ from those estimates and those differences could be material.

*Cash*

Cash consists of cash at major financial institutions. Cash includes $52,422,042 held at Wells Fargo Bank, N.A. in the custody of the Company's custodian, Millennium Trust Company. Additional cash balances of $440,594 are held at Northbrook Bank & Trust in the custody of the Company's administrator, Opus Fund Services.

*Investments and related investment Income*

Interest income is accrued based upon the outstanding principal amount and contractual interest terms of debt investments. For investments with contractual payment-in-kind ("PIK") interest, which represents contractual interest accrued and added to the principal balance that generally becomes due at maturity, the Company will not accrue PIK interest if the investment valuation indicates that the PIK interest is not collectible. Interest income is presented net of servicing fees contractually incurred for servicing Collateral Assets.

For equity investments in limited liability companies with preferred returns, which represent unrealized gains earned on the equity held, the Company will not record unrealized gains if the investment valuation indicates that the face value of the investment and the preferred return are not collectible.

Investments are recorded on the date of binding commitment on a trade-date basis. Realized gains or losses on investments are measured by the difference between the net proceeds from the disposition and the cost basis of the investment, without regard to unrealized gains or losses previously recognized. The Company reports current year changes in fair value of investments as a component of the net change in unrealized appreciation (depreciation) on investments in the consolidated statement of operations.

*Due from Counterparties*

Due from Counterparties represents net amounts receivable from Counterparties in connection with the Company's purchase of Collateral Assets and collection of principal on Collateral Assets.

12

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**2. Summary of Significant Accounting Policies (continued)**

*Fair value of financial instruments*

The Company applies fair value to its financial instruments in accordance with ASC 820 - *Fair Value Measurement* ("ASC 820"). ASC 820 defines fair value, establishes a framework used to measure fair value and requires disclosures for fair value measurements. In accordance with ASC 820, the Company has categorized its financial instruments carried at fair value, based on the priority of the valuation technique, into a three-level fair value hierarchy. Fair value is a market-based measure considered from the perspective of the market participant who holds the financial instrument rather than an entity-specific measure. Therefore, when market assumptions are not readily available, the Company's own assumptions are set to reflect those that management believes market participants would use in pricing the financial instrument at the measurement date.

The availability of observable inputs can vary depending on the financial instrument and is affected by a wide variety of factors, including, for example, the type of product, whether the product is traded on an active exchange or in the secondary market and the current market conditions. To the extent that the valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more subjective judgment. Accordingly, the degree of subjective judgment exercised by the Company in determining fair value is greatest for financial instruments classified as Level 3. See further description of fair value methodology in Note 3.

*Dividends*

Dividends and distributions to shareholders are recorded on the ex-dividend date. The amount paid is based upon earnings estimated by management, monthly. No dividends were recorded in fiscal year 2017.

**3. Investment Valuations and Fair Value Measurements**

*Fair Value – Definition and Hierarchy*

In determining fair value, the Company uses GAAP, which establishes a hierarchy that prioritizes the inputs used to measure fair value. Debt and equity securities that are not publicly traded or whose market prices are not readily available are valued at fair value as determined in good faith by management. The fair values are developed based on the best information available in the circumstances, in the absence of an observable input.  Investments are categorized based on the lowest level of input significant to the fair value measurement, as follows:

      Level 1 – The valuation is based on unadjusted quoted prices in active markets for identical instruments.

      Level 2 – The valuation is based on observable inputs such as quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that

13

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

are not active, and model-based valuation techniques for which all significant inputs are observable in the market.

Level 3 – The valuation is based on unobservable data used when there is little or no market activity and reflects management's own assumptions about how market participants would price such assets.  Level 3 valuations are typically performed using pricing models, discounted cash flow or similar techniques.

Measurement of fair value using level 2 and level 3 inputs necessitates the use of estimates and assumptions that are inherently subjective, and the values determined by management as a result of using such inputs may differ significantly from the values that would have been used had observable quotations in an active market existed, and the differences could be material. The level of input used for valuing securities is not necessarily an indication of the risk associated with investing in those securities.

*Fair Value – Valuation Processes*

The Advisor is responsible for valuation policies and procedures and determining the fair value of the investments and has designated a valuation committee to oversee the valuation process. The valuation committee is comprised of three voting members, each an executive of the Advisor, and each month, the committee approves the valuation for each investment. The valuation process includes consultation with internal professionals and corroboration by third party valuation professionals on a quarterly basis. The valuation committee reviews decisions and recommendations made by internal professionals, changes in fair value measurements and may, as considered appropriate, update fair value guidelines to reflect available information.

*Fair Value – Valuation Techniques and Inputs*

The fair value of debt securities, which includes direct ownership of Collateral Assets and asset-backed facilities, is determined using an income approach.  The income approach uses valuation techniques that measure the net present value of anticipated future economic benefits (i.e. net cash flows).  The estimated net cash flows generally develop an estimate of future cash flows that are expected to occur over the life of the contract based on investment-specific historical performance rates and default rates, loan to value ratios for the facilities, and covenant compliance, including the timeliness of interest payments.  The discount rate presented is an annualized, average estimate developed with respect to the Collateral Assets or the borrowing base for the asset backed facilities, based on contractual borrowing base eligibility rules underlying each facility.  Where a cash flow estimate is not used, other unobservable inputs may be available, including recent transaction information.

The fair value of equity investments in limited liability companies is determined using the practical expedient described in ASC 820-10-35-59 - *Measuring the Fair Value of Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent)*.  These entities, classified as investment companies under ASC 946, own and manage a pool of Collateral Assets. Management reviews source

14

## DLI Capital, Inc. and Subsidiaries
## Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

data for these positions, including monthly financial statements and collateral asset reports, as well as ownership interests owned by the Company. Management also inspects the quality and performance of the underlying Collateral Assets on a regular basis to validate the asset value of those limited liability companies.

*Fair Value Measurements*

The Company's debt investments are categorized as Level 3 investments. The following table provides a reconciliation of the beginning and ending balances for all investments for the year ended December 31, 2017:

| | Asset-backed facilities | Corporate term loans | Whole loans | Real estate loans | Receivables | Total Debt investments |
|---|---|---|---|---|---|---|
| Beginning balance, January 1, 2017 | $ 381,289,351 | 38,155,368 | 205,717,957 | 32,000,484 | 50,205,289 | $ 707,368,449 |
| Purchases, including capitalized interest | 355,880,464 | 48,771,625 | 153,479,263 | 34,177,524 | 17,452,920 | 609,761,796 |
| Principal payments | (283,985,160) | (39,665,112) | (228,387,633) | (35,741,742) | (45,067,950) | (632,847,567) |
| Net realized loss on investments | – | – | (18,823,441) | - | (620,206) | (19,443,647) |
| Net change in unrealized depreciation on investments | – | (3,370,700) | (10,618,921) | - | (2,899,799) | (16,889,420) |
| Ending balance, December 31, 2017 | $ 453,184,655 | 43,891,181 | 101,367,225 | 30,436,266 | 19,070,254 | $ 647,949,581 |

| | |
|---|---|
| Equity investments in limited liability companies | 171,325,387 |
| Total Investments, December 31, 2017 | $ 819,274,968 |

The net change in unrealized depreciation on debt investments still held at December 31, 2017 is $(17,646,896).

The Company transfers investments in and out of Level 1, 2 or 3 as of the beginning balance sheet date, based on changes in the use of observable and unobservable inputs utilized to perform the valuation for the period. During the year ended December 31, 2017, there were no transfers between Levels 1, 2 or 3 of the fair value hierarchy.

15

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**3. Investment Valuations and Fair Value Measurements (continued)**

The following table summarizes the valuation techniques and significant unobservable inputs used for the Company's investments at December 31, 2017:

| Assets | Fair Value at December 31, 2017 | Valuation Technique | Significant Unobservable Inputs | Range of Inputs (Weighted Average) |
|---|---|---|---|---|
| Debt investments | | | | |
| Asset-backed facilities | $ 453,184,655 | Income approach | Loan to value ratio | 59.9% - 100% (90.8%) |
| | | | Effective interest rate [1] | 14.8% - 28.3% (16.6%) |
| Corporate term loans | 37,714,264 | Income approach | Discount rate | 16.3% - 18.6% (16.6%) |
| | 6,176,917 | Estimated recovery | Net realizable value of Collateral Assets | 85.0% (85.0%) |
| Whole loans | 101,367,225 | Income approach | Discount rate | 17.4% - 23.7% (20.7%) |
| Real estate loans | 29,131,266 | Income approach | Effective interest rate [1] | 12.5% - 21.8% (21.3%) |
| | 1,305,000 | Estimated recovery | Recent appraisals | N/A |
| Receivables | 19,070,254 | Income approach | Discount rate | 14.5% (14.5%) |
| | $ 647,949,581 | | | |
| Equity interests in limited liability companies | 171,325,387 | Investments valued using net asset value as a practical expedient | | |
| | $ 819,274,968 | Total Investments in securities | | |

[1]   Effective interest rate is calculated as the monthly interest income net of servicing fees and any impairments, as applicable, and is annualized.

**4. Agreements and Related Party Transactions**

The Company considers the Advisor, its principal owner, members of management and entities under common control to be related parties to the Company.  Amounts due from and due to related parties are generally settled in the normal course of business.

*Investment Management Agreement*

The Company has entered into an investment management agreement with the Advisor.  Under the terms of that agreement, the Advisor provides management services to the Company.  The management fee is calculated and payable monthly in advance at the annual rate of 1% of the Company's gross assets.

The Advisor also earns a performance fee each month, calculated as 20% monthly of the earnings before interest and taxes, including management fee, attributable to each series of common shares, to the extent that the net asset value of a series of shares of the Company exceeds the prior high net asset value of the series, as defined in the Investment Management Agreement.  If there is a net loss in any month, the performance fee will not apply to future periods until such net loss has been recovered.

## DLI Capital, Inc. and Subsidiaries
### Notes to Consolidated Financial Statements

**4. Agreements and Related Party Transactions (continued)**

The Advisor may enter into agreements to reduce or waive management fees and performance fees on the gross assets and earnings allocable to certain share classes of the Company and underlying investors in the Feeder Funds.

For the year ended December 31, 2017, the Company incurred $9,360,175 in management fees and $19,232,510 in performance fees.  Of these amounts, the Advisor voluntarily waived management fees of $592,788.  At December 31, 2017, the Company owed the Advisor $81,395 of management fees and $1,404,281 of performance fees.

*Expense Limitation Agreement*

The Advisor has agreed to pay any expenses of the Company, other than management fees, performance fees or Transaction Expenses (as defined below), to the extent that such expenses exceed 1% on an annual basis or 0.0833% per month.  To the extent the Advisor pays expenses of the Company pursuant to the preceding sentence, the Advisor may recoup the amount it pays on behalf of the Company by charging the Company 0.0833% per month for expenses in future months (even if the actual expenses for that month are less than 0.0833%) until the Advisor has recovered from the Company all expenses previously paid by the Advisor on the Company's behalf.  The Advisor may, at its sole discretion, modify or eliminate this expense limitation at any time, provided that the Advisor gives the Feeder Funds and their investors thirty (30) days advance notice before any change or elimination.  "Transaction Expenses" consist of all amounts paid by the Company (a) to effect the purchase or sale of a specific investment, including without limitation brokerage commissions, origination fees, servicing fees, clearing and settlement charges or professional fees, and (b) all amounts paid by the Company in connection with investments, including without limitation, interest, origination fees, points, or professional fees and (c) any taxes paid by the Company.  The Advisor has not paid any expenses on behalf of the Company pursuant to this agreement and was not entitled to any recoupment amount under the expense limitation agreement for the year ended December 31, 2017.

**5. Debt**

On October 1, 2016, the Company entered into loan and security agreements with each of its Feeder Funds, whereby the Feeder Funds each provide a revolving credit facility, collateralized by the assets of the Company, up to $2,000,000,000, which mature on September 30, 2021. The outstanding principal balances are due in full at the maturity date. The facilities bear interest at 12% annually of the principal balance outstanding, payable monthly, in arrears.

The principal balances outstanding at December 31, 2017 due to each of the Feeder Funds are $435,858,138 payable to Direct Lending Income Fund, L.P. and $131,786,085 payable to Direct Lending Income Feeder Fund, Ltd. For the year ended December 31, 2017, the Company incurred $85,040,864 in interest expense related to the facilities, of which $5,785,306 is payable to the Feeder Funds at December 31, 2017.

17

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**6. Stockholders' Equity**

On October 1, 2016, the Company adopted a Multiple Class Plan (the "Plan") under which the Company issues three classes of stock: Class D, Class O and Class S common stock, which have equal rights to assets of the Company, except that Class D common stock is entitled to one vote per share, and Class O common stock and Class S common stock are not entitled to vote. Class D common stock is exclusively issued to Direct Lending Income Fund, L.P. and Class O common stock is exclusively issued to Direct Lending Income Feeder Fund, Ltd.

The Company has authorized and issued the following shares of common stock at December 31, 2017:

| Class of shares | Authorized | Issued | Outstanding |
|---|---|---|---|
| Class D Common Stock, par value $0.001 per share | 500,000,000 | 29,436,714.76 | 24,397,405.70 |
| Class O Common Stock, par value $0.001 per share | 500,000,000 | 7,801,208.93 | 7,363,935.63 |
| Class S Common Stock, par value $0.001 per share | 500,000,000 | 3,512,145.57 | — |
| Total Shares Outstanding | | 40,750,069.26 | 31,761,341.33 |

Transactions in common stock shares during the year ended December 31, 2017 were as follows:

| | Beginning balance | Issuance of common stock | Redemptions and cancellations of common stock | Ending balance |
|---|---|---|---|---|
| **Shares** | | | | |
| *Class D* | 15,272,636.30 | 14,164,078.46 | (5,039,309.06) | 24,397,405.70 |
| *Class O* | 1,335,826.50 | 6,465,382.43 | (437,273.30) | 7,363,935.63 |
| Class S | — | 3,512,145.57 | (3,512,145.57) | — |
| Total Shares | 16,608,462.80 | 24,141,606.46 | (8,988,727.93) | 31,761,341.33 |
| | | | | |
| **Amount** | | | | |
| *Class D* | $ 152,726,363 | $ 141,640,785 | $ (50,393,091) | $ 243,974,057 |
| *Class O* | 13,358,265 | 64,653,824 | (4,372,733) | 73,639,356 |
| Class S | — | 35,121,456 | (35,121,456) | — |
| Total Amounts | $ 166,084,628 | $ 241,416,065 | $ (89,887,280) | $ 317,613,413 |

The Plan dictates that the Company shall maintain a $10 per share purchase price by distributing earnings to stockholders or cancelling shares through a reverse stock split in the event of a net loss, monthly. For the year ended December 31, 2017, the Company recorded a total net loss of $2,601,817, paid $172,696 in return of capital distributions and cancelled 277,451.37 shares.

18

## DLI Capital, Inc. and Subsidiaries
### Notes to Consolidated Financial Statements

**7. Income Taxes**

The Company accounts for income taxed under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements. Under this method, the Company determines deferred tax assets and liabilities on the basis of the differences between the financial statement and tax basis of assets and liabilities by using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

The Company recognizes deferred tax assets to the extent that management believes that these assets are more likely than not to be realized. In making such a determination, management considers all positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax planning strategies, and results of recent operations. If management determines that the Company would be able to realize deferred tax assets in the future in excess of their net recorded amount, the Company would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes.

On December 22, 2017, the U.S. enacted the Tax Cuts and Jobs Act (the "Act"), which makes broad and complex changes to U.S. tax law. The Act lowered the Company's U.S. statutory federal income tax rate from 35% to 21% effective January 1, 2018.

The Company recorded a current net federal income tax benefit of $684,566 for the year ended December 31, 2017. Additionally, the Company has an amount of income tax net operating loss carryforward that can be applied to future periods, resulting in a deferred tax asset of $199,468 as of December 31, 2017. The deferred tax asset on the consolidated statement of assets and liabilities has been adjusted to reflect the 21% tax rate applicable beginning January 1, 2018 in accordance with the Act. As of December 31, 2017, the Company has an income tax net operating loss carryforward of $949,878, which can be applied to future years through December 31, 2037.

The Company records interest accrued and penalties related to unrecognized tax benefits in income tax expense in the accompanying consolidated statement of operations.  Accrued interest and penalties are included on the related tax asset or liability line in the consolidated statement of assets and liabilities. As of December 31, 2017, the Company had not accrued any interest or penalties related to unrecognized tax benefits.

The Company recognizes the tax benefits of uncertain tax positions only when the position is more likely than not to be sustained, assuming examination by tax authorities. Management has analyzed the Company's tax positions and concluded that no liability for unrecognized tax benefits should be recorded related to uncertain tax positions expected to be taken on the tax returns for the years open to examination, 2016 and 2017. The Company identifies its major tax jurisdictions as U.S. federal and California; however, the Company is not aware of any tax positions for which it is reasonably possible that the total amounts of unrecognized tax benefits will change materially in the next twelve months.

# DLI Capital, Inc. and Subsidiaries
## Notes to Consolidated Financial Statements

**8. Commitments, Contingencies and Indemnifications**

In the normal course of business, the Company enters into contracts with third parties, including without limitation certain service providers and Counterparties, which incorporate a variety of representations, warranties, and general indemnification obligations Any exposure to the Company under these arrangements is unknown as it would involve future claims that may be made against the Company; however, based on the Company's historical experience, the risk of loss is remote. As such, the Company has not accrued any liability in connection with such contingent obligations.

**9. Financial Highlights**

Below is the schedule of financial highlights of the Company for the year ended December 31, 2017. Financial highlights are calculated for each permanent, non-managing class of shares. An individual shareholder's financial highlights may vary based on different financial arrangements such as management fees, performance fees and the timing of capital transactions.

|  | Class D | Class O |
|---|---|---|
| **Per Share Data:** | | |
| Net asset value, beginning of the year | $ 10.00 | $ 10.00 |
| Income from investment operations: | | |
| Net investment income (loss) | 0.67 | 0.61 |
| Net realized and unrealized gains (losses) on investments | (0.79) | (0.71) |
| Net decrease in net assets resulting from operations | (0.12) | (0.10) |
| Distributions | (0.01) | (0.00) |
| Reverse stock split | 0.13 | 0.10 |
| Total increase (decrease) in net assets | – | – |
| Net asset value, end of the year | $ 10.00 | $ 10.00 |
| | | |
| Total return | (1.39%) | (1.37%) |
| Shares outstanding, end of the year | 24,397,405.70 | 7,363,935.63 |
| | | |
| **Ratio to average net assets:** | | |
| Net investment Income [1] | 6.69% | 6.11% |
| | | |
| Operating expense [1] | 40.05% | 35.55% |
| Performance fee | 8.42% | 8.28% |
| Total expenses | 48.47% | 43.83% |

[1]   During the year, the Advisor voluntarily waived a portion of its management fee (equal to 0.27% of average net assets for Class D shares, 0.18% for Class O shares).

**DLI Capital, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements

**9. Financial Highlights (continued)**

The total return calculated above reflects all income and expenses of the Company, including interest expense on debt balances due to the Feeder Funds. Additionally, the basis for total return for the Company is the net assets of the Company, which is comprised of all assets and liabilities of the Company, including debt balances due to the Feeder Funds. Accordingly, the total return and net investment income and expense ratios as reflected on the Feeder Funds' respective financial statements are more indicative of investors' returns and operating ratios.  Refer to the financial statements of the Feeder Funds for further information.

**10. Subsequent Events**

Management has evaluated subsequent events through April 27, 2018, the date the consolidated financial statements were available to be issued.  Management has determined that there are no other material events that would require adjustment to or disclosure in the Company's consolidated financial statements.

Electronically FILED by Superior Court of California, County of Los Angeles on 04/28/2020 11:51 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Wong,Deputy Clerk

Case 2:20-cv-05774-DSF-MRW   Document 1   Filed 06/29/20   Page 102 of 127   Page ID #:110

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY |
|---|---|
| | *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
DELOITTE & TOUCHE, LLP, a Delaware limited liability partnership, and
DELOITTE TAX, LLP, a Delaware limited liability partnership, and OPUS FUND
SERVICES (USA) LLC, a Delaware limited liability company, and DOES 1-50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ALFRED JACKSON, MICHAEL JACKSON, GRANGER CONSTRUCTION
COMPANY, WEINER ACQUISITION COMPANY, LLC, MILLICENT
CALICCHIO, VALERIE SABET, MAXX VENTURE FUND H, LLC (continued)

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | 20GDCV00419 |
| GLENDALE COURTHOUSE | |
| 600 E. Broadway | |
| Glendale, CA 91206 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Eugene Ashley SBN 171885
Hoge, Fenton, Jone & Appel
60 S. Market St., Suite 1400, San Jose, CA 95113 408.287.9501

Sherri R. Carter Executive Officer / Clerk of Court

| DATE: | Clerk, by | M. Wong | , Deputy |
|---|---|---|---|
| *(Fecha)* 04/28/2020 | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)           ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

**SUM-200(A)**

| SHORT TITLE:<br>JACKSON v. DELOITTE & TOUCHE LLP, et al. | CASE NUMBER:<br>20GDCV00419 |
|---|---|

**INSTRUCTIONS FOR USE**

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☒ Plaintiff    ☐ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

OGIE, LLC, THE STEVEN C. CALICCHIO FOUNDATION, CHARITABLE LEAD ANNUITY TRUST "A" U/W OF STEVEN CALICCHIO, CHARITABLE LEAD ANNUITY TRUST "B" U/W OF STEVEN CALICCHIO, EXEMPT TRUST U/W OF STEVEN CALICCHIO FBO AXEL CALICCHIO, EXEMPT TRUST U/W OF STEVEN CALICCHIO FBO ORIANA CALICCHIO, AJC LEGACY INVESTMENTS, LLC, OCC LEGACY INVESTMENS, LLC

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Glendale Courthouse<br>600 East Broadway, Glendale, CA 91206 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>04/28/2020<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ M. Wong _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>20GDCV00419 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Curtis A. Kin | E | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 04/28/2020
    (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By M. Wong_____, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

Electronically FILED by Superior Court of California, County of Los Angeles on 06/05/2020 04:50 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Young,Deputy Clerk

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| EUGENE ASHLEY | SBN: 171885<br>HOGE, FENTON, JONES & APPEL, INC.<br>60 S. MARKET STREET, SUITE 1400<br>SAN JOSE, CA 95113<br>TELEPHONE NO.: (408) 287-9501 | FAX NO. (408) 287-2583 | E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* PLAINTIFFS | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

STREET ADDRESS: 600 EAST BROADWAY

MAILING ADDRESS:

CITY AND ZIP CODE: GLENDALE, CA 91206-4304

BRANCH NAME: GLENDALE COURTHOUSE

| PLAINTIFF/PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER:<br>20GDCV00419 |
|---|---|
| DEFENDANT/RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>33004428A VXP |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☒ Summons
   b. ☒ Complaint
   c. ☒ Alternative Dispute Resolution (ADR) package
   d. ☒ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☒ other *(specify documents):* CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE

3. a. Party served *(specify name of party as shown on documents served):*
   **DELOITTE & TOUCHE LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**

   b. ☒ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CSC LAWYERS INCORPORATING SERVICE BY LEAVING DOCUMENTS WITH KAITLYN MANNIX - AUTHORIZED TO ACCEPT SERVICE OF PROCESS**

4. Address where the party was served: **2710 GATEWAY OAKS DR. STE 150N**
   **SACRAMENTO, CA 95833**

5. I served the party *(check proper box)*
   a. ☒ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 05/29/2020   (2) at *(time):* 10:20 am

   b. ☐ **by substituted service.** On *(date):*   at *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

   *(1)* ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

   *(2)* ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   *(3)* ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   *(4)* ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*   from *(city):*   or ☐ a declaration of mailing is attached.

   *(5)* ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

---

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Page 1 of 2<br>Code of Civil Procedure, § 417.10<br>POS010-1/33004428A |

| PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER: |
| RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | 20GDCV00419 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*              (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

  ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of *(specify):*
  c. ☐ as occupant.
  d. ☒ On behalf of *(specify):* **DELOITTE & TOUCHE LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**
    under the following Code of Civil Procedure section:

|  |  |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☒ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
|  | ☐ other: |

7. Person who served papers
  a. Name: **DEJA M. JEFFERSON C/O ASAP Legal, LLC**
  b. Address: **255 N Market St Suite 180 San Jose, CA 95110**
  c. Telephone number: **(408) 564-7360**
  d. The fee for service was: **$ 194.00**
  e. I am:

    ASAP
    ATTORNEY SERVICES LLC

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☒ registered California process server:
      (i) ☐ owner   ☐ employee   ☒ independent contractor.
      (ii) Registration No.: **2019-60**
      (iii) County: **SACRAMENTO**

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

    Date: **05/29/2020**
    **ASAP Legal, LLC**
    **255 N Market St Suite 180**
    **San Jose, CA 95110**
    **(408) 564-7360**
    **www.ASAPLegal.com**

    **DEJA M. JEFFERSON**              ▶         (SIGNATURE)
    (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
## Glendale Courthouse
600 East Broadway, Glendale, CA 91206

PLAINTIFF:
## Alfred Jackson  et al

DEFENDANT:
## Deloitte & Touche LLP, a Delaware Limited Liability Partnership et

| Reserved for Clerk's File Stamp |
|---|
| **FILED**<br>Superior Court of California<br>County of Los Angeles<br>04/28/2020<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ M. Wong _____ Deputy |

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:
## 20GDCV00419

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 09/03/2020 | Time: 8:30 AM | Dept.: E |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT  FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: _04/28/2020_____

_____
Curtis A. Kin / Judge
Judicial Officer

---

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☐ by depositing in the United States mail at the courthouse in _Glendale_____, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Eugene Ashley
Sixty South Market Street, Suite 1400
San Jose, CA 95113

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: _04/28/2020_____

By _M. Wong_____
Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter V@^^

Electronically FILED by Superior Court of California, County of Los Angeles on 06/05/2020 04:59 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Young,Deputy Clerk

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| EUGENE ASHLEY | SBN: 171885<br>HOGE, FENTON, JONES & APPEL, INC.<br>60 S. MARKET STREET, SUITE 1400<br>SAN JOSE, CA 95113<br>TELEPHONE NO.: (408) 287-9501 | FAX NO. (408) 287-2583 | E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* PLAINTIFFS | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
|---|
| STREET ADDRESS: 600 EAST BROADWAY |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: GLENDALE, CA 91206-4304 |
| BRANCH NAME: GLENDALE COURTHOUSE |

| PLAINTIFF/PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | 20GDCV00419 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>33004428A VXP |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☒  Summons
   b. ☒  Complaint
   c. ☒  Alternative Dispute Resolution (ADR) package
   d. ☒  Civil Case Cover Sheet
   e. ☐  Cross-complaint
   f. ☒  other *(specify documents):* CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE

3. a.  Party served *(specify name of party as shown on documents served):*
   **DELOITTE & TOUCHE LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**

   b. ☒  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CSC LAWYERS INCORPORATING SERVICE BY LEAVING DOCUMENTS WITH KAITLYN MANNIX - AUTHORIZED TO ACCEPT SERVICE OF PROCESS**

4. Address where the party was served: **2710 GATEWAY OAKS DR. STE 150N**
   **SACRAMENTO, CA 95833**

5. I served the party *(check proper box)*
   a. ☒  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 05/29/2020    (2) at *(time):* 10:20 am

   b. ☐  **by substituted service.** On *(date):*  at *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

      (1) ☐  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*  from *(city):*  or ☐ a declaration of mailing is attached.

      (5) ☐  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>POS010-1/33004428A |
|---|---|---|

| PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER: |
| RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | 20GDCV00419 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) *(Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

 

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.
    b. ☐ as the person sued under the fictitious name of *(specify):*
    c. ☐ as occupant.
    d. ☒ On behalf of *(specify):* **DELOITTE & TOUCHE LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**
    under the following Code of Civil Procedure section:

        ☐ 416.10 (corporation)              ☐ 415.95 (business organization, form unknown)
        ☐ 416.20 (defunct corporation)        ☐ 416.60 (minor)
        ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)
        ☒ 416.40 (association or partnership)     ☐ 416.90 (authorized person)
        ☐ 416.50 (public entity)            ☐ 415.46 (occupant)
                                    ☐ other:

7. Person who served papers
    a. Name: **DEJA M. JEFFERSON C/O ASAP Legal, LLC**
    b. Address: **255 N Market St Suite 180  San Jose, CA 95110**
    c. Telephone number: **(408) 564-7360**
    d. The fee for service was: **$ 194.00**
    e. I am:

        (1) ☐ not a registered California process server.
        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
        (3) ☒ registered California process server:
            (i) ☐ owner     ☐ employee     ☒ independent contractor.
            (ii) Registration No.: **2019-60**
            (iii) County: **SACRAMENTO**

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

 

Date: **05/29/2020**
**ASAP Legal, LLC**
**255 N Market St Suite 180**
**San Jose, CA 95110**
**(408) 564-7360**
**www.ASAPLegal.com**

 

| **DEJA M. JEFFERSON** | ▶ |
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | (SIGNATURE) |

Electronically FILED by Superior Court of California, County of Los Angeles on 03/04/2020 03:46 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Young, Deputy Clerk

1  Eugene Ashley (State Bar No. 171885)
   HOGE, FENTON, JONES & APPEL, INC.
2  Sixth South Market Street, Suite 1400
   San Jose, CA  95113
3  Telephone:  408.287.9501
   Facsimile:  408.287.2583
4
   Michael Paris, Esq. (*pro hac vice pending*)
5  William C. Nystrom, Esq. (*pro hac vice pending*)
   Nina Hirsch, Esq. (*pro hac vice pending*)
6  NYSTROM BECKMAN & PARIS LLP
   One Marina Park Drive, 15th Floor
7  Boston, Massachusetts 02210
   Telephone: (617) 778-9100
8  Facsimile: (617) 778-9110

9  Attorneys for Plaintiffs

10
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
11
                        COUNTY OF LOS ANGELES
12

| | |
|---|---|
| 13  ALFRED JACKSON, MICHAEL<br>JACKSON, GRANGER CONSTRUCTION<br>COMPANY, WIENER ACQUISITION<br>14  COMPANY, LLC, MILLICENT<br>CALICCHIO, VALERIE SABET, MAXX<br>15  VENTURE FUND H, LLC, OGIE, LLC,<br>THE STEVEN C. CALICCHIO<br>16  FOUNDATION, CHARITABLE LEAD<br>ANNUITY TRUST "A" U/W OF STEVEN<br>17  CALICCHIO, CHARITABLE LEAD<br>ANNUITY TRUST "B" U/W OF STEVEN<br>18  CALICCHIO, EXEMPT TRUST U/W OF<br>STEVEN CALICCHIO FBO AXEL<br>19  CALICCHIO, EXEMPT TRUST U/W OF<br>STEVEN CALICCHIO FBO ORIANA<br>20  CALICCHIO, AJC LEGACY<br>INVESTMENTS, LLC, OCC LEGACY<br>21  INVESTMENTS, LLC, | CASE NO.  20GDCV00419<br><br>**APPLICATION FOR *PRO HAC VICE*<br>ADMISSION OF NINA HIRSCH;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT;<br>VERIFIED APPLICATION OF NINA<br>HIRSCH**<br><br>***Affidavit Signature via facsimile***<br><br>Date:<br>Time: 9:00 a.m.<br>Dept. |
| 22                    Plaintiffs, | |
| 23          v. | |
| 24  DELOITTE & TOUCHE LLP, a Delaware<br>limited liability partnership, and<br>25  DELOITTE TAX, LLP, a Delaware limited<br>liability partnership, and OPUS FUND<br>26  SERVICES (USA) LLC, a Delaware<br>limited liability company, | |
| 27                    Defendants. | |
| 28 | |

Pursuant to California Rules of Court, 9.40 and 8.54, Eugene Ashley, hereby submits an application for *pro hac vice* admission of Nina Hirsch to appear as counsel for Plaintiffs Alfred Jackson, Michael Jackson, Granger Construction Company, Wiener Acquisition Company, LLC, Millicent Calicchio, Valerie Sabet, Maxx Venture Fund H, LLC, Ogie, LLC, The Steven C. Calicchio Foundation, Charitable Lead Annuity Trust "A" U/W of Steven Calicchio, Charitable Lead Annuity Trust "B" U/W of Steven Calicchio, Exempt Trust U/W of Steven Calicchio FBO Axel Calicchio, Exempt Trust U/W of Steven Calicchio FBO Oriana Calicchio, AJC Legacy Investments, LLC, OCC Legacy Investments, LLC.

This application is based on the accompanying memorandum of points and authorities and verified application of Nina Hirsch.

Dated:  May 1, 2020                                    HOGE, FENTON, JONES & APPEL, INC.

                                                       By: _____
                                                           Eugene Ashley
                                                           Attorneys for Plaintiffs

- 2 -

**MEMORANDUM IN SUPPORT OF APPLICATION FOR NINA HIRSCH *PRO HAC VICE* ADMISSION TO APPEAR AS COUNSEL FOR PLAINTIFFS**

Rule 9.40 of the California Rules of Court provides the means and requirements by which an attorney may appear as counsel *pro hac vice*. Under this rule, the application shall be made by motion as set forth in the California Rules of Court, rule 8.54, and it shall be accompanied by the verified application of the subject attorney setting forth the requisite information.

As demonstrated in the attached verified application, Nina Hirsch satisfied the requirements set out in rule 9.40 for admission to appear in this action *pro hac vice* as counsel for Plaintiffs. Ms. Hirsch resides outside of California and is an attorney in good standing with the bar of the Commonwealth of Massachusetts, along with all state and federal courts to which she has been admitted. At the request of Plaintiffs, Ms. Hirsch seeks an order authorizing her to appear on Plaintiffs' behalf.

Per rule 9.40(c)(2), Counsel for Plaintiffs has notified and provided copies of this application and supporting documents to the State Bar of California at its Los Angeles office. And in compliance with rule 9.40(e), Counsel has submitted the required $50.00 fee for the application of Ms. Hirsch.

Based on these facts and the supporting information provided in the attached verified application, counsel for Plaintiffs hereby request that Ms. Hirsch be permitted to appear as counsel *pro hac vice* for Plaintiffs in this action.

Dated: May 1, 2020

HOGE, FENTON, JONES & APPEL, INC.

By: _____

Eugene Ashley
Attorneys for Plaintiffs

- 3 -

**VERIFIED APPLICATION OF NINA HIRSCH FOR PRO HAC VICE**

**ADMISSION TO APPEAR AS COUNSEL FOR PLAINTIFFS**

Pursuant to California Rules of Court 8.54 and 9.40, I, Nina Hirsch, an attorney in good standing in the Commonwealth of Massachusetts, do hereby apply for *pro hac vice* admission to appear before the California State Court, Los Angeles County, on behalf of Plaintiffs Alfred Jackson, Michael Jackson, Granger Construction Company, Wiener Acquisition Company, LLC, Millicent Calicchio, Valerie Sabet, Maxx Venture Fund H, LLC, Ogie, LLC, The Steven C. Calicchio Foundation, Charitable Lead Annuity Trust "A" U/W of Steven Calicchio, Charitable Lead Annuity Trust "B" U/W of Steven Calicchio, Exempt Trust U/W of Steven Calicchio FBO Axel Calicchio, Exempt Trust U/W of Steven Calicchio FBO Oriana Calicchio, AJC Legacy Investments, LLC, OCC Legacy Investments, LLC, in the above-entitled action.

In support of this application, I certify the following under oath:

1.     I am an attorney at Nystrom Beckman & Paris, LLP, and my business office is located at One Marine Park Drive, 15th Floor, Boston, Massachusetts 02210.  My residence is also located in Massachusetts.

2.     I am not a California resident, nor do I regularly engage in practice or other business in California.

3.     I have been admitted to practice law before the following courts: Commonwealth of Massachusetts (State Bar No. 694860) since 2015; and United States District Court for the District of Massachusetts since 2018.

4.     I am presently a member in good standing of the bars of the courts listed above.

5.     I have never been suspended or disbarred from any court.

6.     Local counsel of record with whom I am associated in this matter is Eugene Ashley of Hoge, Fenton, Jones & Appel, Inc.  Mr. Ashley is an active member in good standing with the State Bar of California, State Bar Number 171885, and his office is located at Sixty South Market Street, Suite 1400, San Jose, CA 95113.  His office phone number is (408) 287-9501.

- 4 -

7.     A copy of the Application for *Pro Hac Vice* Admission of Nina Hirsch to Appear as Counsel for Plaintiffs and supporting Memorandum of Points and Authorities and Verified Application of Nina Hirsch were served upon the State Bar of California.

8.     Payment of the required $50.00 in support of the Application was submitted to the California State Bar pursuant to rule 9.40(e) of the California Rules of Court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that the application was executed on this $27$ day of April, 2020, at Boston, Massachusetts.

Nina Hirsch

APPLICATION FOR *PRO HAC VICE* ADMISSION OF NINA HIRSCH; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; VERIFIED APPLICATION OF NINA HIRSCH

**<u>PROOF OF SERVICE</u>**

**Jackson, et al. v. Deloitte & Touch, et al.**

**STATE OF CALIFORNIA, COUNTY OF SANTA CLARA**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Santa Clara, State of California.  My business address is 60 South Market Street, Suite 1400, San Jose, CA 95113-2396.

On May 1, 2020, I served true copies of the following document(s) described as **APPLICATION FOR PRO HAC VICE ADMISSION OF NINA HIRSCH; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; VERIFIED APPLICATION OF NINA HIRSCH** on the interested parties in this action as follows:

The State Bar of California
180 Howard Street
San Francisco, CA  94105

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Hoge, Fenton, Jones & Appel, Inc. for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at San Jose, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 1, 2020, at San Jose, California.


M'Liss Jarvis Bounds

3591994

-1-

Electronically FILED by Superior Court of California, County of Los Angeles on 05/07/2020 03:50 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Young,Deputy Clerk

Eugene Ashley (State Bar No. 171885)
HOGE, FENTON, JONES & APPEL, INC.
Sixth South Market Street, Suite 1400
San Jose, CA  95113
Telephone:  408.287.9501
Facsimile:  408.287.2583

Michael Paris, Esq. (*pro hac vice pending*)
William C. Nystrom, Esq. (*pro hac vice pending*)
Nina Hirsch, Esq. (*pro hac vice pending*)
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, Massachusetts 02210
Telephone: (617) 778-9100
Facsimile: (617) 778-9110

Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| ALFRED JACKSON, MICHAEL JACKSON, GRANGER CONSTRUCTION COMPANY, WIENER ACQUISITION COMPANY, LLC, MILLICENT CALICCHIO, VALERIE SABET, MAXX VENTURE FUND H, LLC, OGIE, LLC, THE STEVEN C. CALICCHIO FOUNDATION, CHARITABLE LEAD ANNUITY TRUST "A" U/W OF STEVEN CALICCHIO, CHARITABLE LEAD ANNUITY TRUST "B" U/W OF STEVEN CALICCHIO, EXEMPT TRUST U/W OF STEVEN CALICCHIO FBO AXEL CALICCHIO, EXEMPT TRUST U/W OF STEVEN CALICCHIO FBO ORIANA CALICCHIO, AJC LEGACY INVESTMENTS, LLC, OCC LEGACY INVESTMENTS, LLC, | CASE NO.  20GDCV00419 **APPLICATION FOR *PRO HAC VICE* ADMISSION OF WILLIAM C. NYSTROM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; VERIFIED APPLICATION OF WILLIAM C. NYSTROM** ***Affidavit Signature via facsimile*** Date: Time: 9:00 a.m. Dept. |
| Plaintiffs, | |
| v. | |
| DELOITTE & TOUCHE LLP, a Delaware limited liability partnership, and DELOITTE TAX, LLP, a Delaware limited liability partnership, and OPUS FUND SERVICES (USA) LLC, a Delaware limited liability company, | |
| Defendants. | |

1   Pursuant to California Rules of Court, 9.40 and 8.54, Eugene Ashley, hereby submits an

2   application for *pro hac vice* admission of William C. Nystrom to appear as counsel for Plaintiffs

3   Alfred Jackson, Michael Jackson, Granger Construction Company, Wiener Acquisition

4   Company, LLC, Millicent Calicchio, Valerie Sabet, Maxx Venture Fund H, LLC, Ogie, LLC,

5   The Steven C. Calicchio Foundation, Charitable Lead Annuity Trust "A" U/W of Steven

6   Calicchio, Charitable Lead Annuity Trust "B" U/W of Steven Calicchio, Exempt Trust U/W of

7   Steven Calicchio FBO Axel Calicchio, Exempt Trust U/W of Steven Calicchio FBO Oriana

8   Calicchio, AJC Legacy Investments, LLC, OCC Legacy Investments, LLC.

9   This application is based on the accompanying memorandum of points and authorities

10   and verified application of William C. Nystrom.

11

12   Dated:  May 1, 2020                           HOGE, FENTON, JONES & APPEL, INC.

13                                                 By: _____

14                                                     Eugene Ashley
                                                       Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

**MEMORANDUM IN SUPPORT OF APPLICATION FOR WILLIAM C. NYSTROM'S *PRO HAC VICE* ADMISSION TO APPEAR AS COUNSEL FOR PLAINTIFFS**

Rule 9.40 of the California Rules of Court provides the means and requirements by which an attorney may appear as counsel *pro hac vice*.  Under this rule, the application shall be made by motion as set forth in the California Rules of Court, rule 8.54, and it shall be accompanied by the verified application of the subject attorney setting forth the requisite information.

As demonstrated in the attached verified application, William C. Nystrom satisfied the requirements set out in rule 9.40 for admission to appear in this action *pro hac vice* as counsel for Plaintiffs.   Mr. Nystrom resides outside of California and is an attorney in good standing with the bar of the Commonwealth of Massachusetts, along with all state and federal courts to which he has been admitted.  At the request of Plaintiffs, Mr. Nystrom seeks an order authorizing him to appear on Plaintiffs' behalf.

Per rule 9.40(c)(2), Counsel for Plaintiffs have notified and provided copies of this application and supporting documents to the State Bar of California at its Los Angeles office. And in compliance with rule 9.40(e), Counsel has submitted the required $50.00 fee for the application of Mr. Nystrom.

Based on these facts and the supporting information provided in the attached verified application, counsel for Plaintiffs hereby request that Mr. Nystrom be permitted to appear as counsel *pro hac vice* for Plaintiffs in this action.

Dated:  May 1, 2020                                  HOGE, FENTON, JONES & APPEL, INC.

By: _____

Eugene Ashley
Attorneys for Plaintiffs

- 3 -

**VERIFIED APPLICATION OF WILLIAM C. NYSTROM FOR PRO HAC VICE ADMISSION TO APPEAR AS COUNSEL FOR PLAINTIFFS**

Pursuant to California Rules of Court 8.54 and 9.40, I, William C. Nystrom, an attorney in good standing in the Commonwealth of Massachusetts, do hereby apply for *pro hac vice* admission to appear before the California State Court, Los Angeles County, on behalf of Plaintiffs Alfred Jackson, Michael Jackson, Granger Construction Company, Wiener Acquisition Company, LLC, Millicent Calicchio, Valerie Sabet, Maxx Venture Fund H, LLC, Ogie, LLC, The Steven C. Calicchio Foundation, Charitable Lead Annuity Trust "A" U/W of Steven Calicchio, Charitable Lead Annuity Trust "B" U/W of Steven Calicchio, Exempt Trust U/W of Steven Calicchio FBO Axel Calicchio, Exempt Trust U/W of Steven Calicchio FBO Oriana Calicchio, AJC Legacy Investments, LLC, OCC Legacy Investments, LLC, in the above-entitled action.

In support of this application, I certify the following under oath:

1.     I am an attorney at Nystrom Beckman & Paris, LLP, and my business office is located at One Marine Park Drive, 15th Floor, Boston, Massachusetts 02210.  My residence is also located in Massachusetts.

2.     I am not a California resident, nor do I regularly engage in practice or other business in California.

3.     I have been admitted to practice law before the following courts: Commonwealth of Massachusetts (State Bar No. 559656) since 1991; and United States District Court for the District of Massachusetts since 1992.

4.     I am presently a member in good standing of the bars of the courts listed above.

5.     I have never been suspended or disbarred from any court.

6.     Local counsel of record with whom I am associated in this matter is Eugene Ashley of Hoge, Fenton, Jones & Appel, Inc.  Mr. Ashley is an active member in good standing with the State Bar of California, State Bar Number 171885, and his office is located at Sixty South Market Street, Suite 1400, San Jose, CA 95113.  His office phone number is (408) 287-9501.

- 4 -

7.      A copy of the Application for *Pro Hac Vice* Admission of William C. Nystrom to Appear as Counsel for Plaintiffs and supporting Memorandum of Points and Authorities and Verified Application of William C. Nystrom were served upon the State Bar of California.

8.      Payment of the required $50.00 in support of the Application was submitted to the California State Bar pursuant to rule 9.40(e) of the California Rules of Court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that the application was executed on this __27__ day of April, 2020, at Boston, Massachusetts.

William C. Nystrom

APPLICATION FOR *PRO HAC VICE* ADMISSION OF WILLIAM C. NYSTROM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; VERIFIED APPLICATION OF WILLIAM C. NYSTROM

Scanned by CamScanner

**<u>PROOF OF SERVICE</u>**

**Jackson, et al. v. Deloitte & Touch, et al.**

**STATE OF CALIFORNIA, COUNTY OF SANTA CLARA**

     At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Santa Clara, State of California.  My business address is 60 South Market Street, Suite 1400, San Jose, CA 95113-2396.

     On May 1, 2020, I served true copies of the following document(s) described as **APPLICATION FOR PRO HAC VICE ADMISSION OF WILLIAM C. NYSTROM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; VERIFIED APPLICATION OF WILLIAM C. NYSTROM** on the interested parties in this action as follows:

The State Bar of California
180 Howard Street
San Francisco, CA  94105

     **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Hoge, Fenton, Jones & Appel, Inc. for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at San Jose, California.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     Executed on May 1, 2020, at San Jose, California.


_____
M'Liss Jarvis Bounds

-1-

Electronically FILED by Superior Court of California, County of Los Angeles on 06/05/2020 04:50 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Young, Deputy Clerk

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| EUGENE ASHLEY | SBN: 171885<br>HOGE, FENTON, JONES & APPEL, INC.<br>60 S. MARKET STREET, SUITE 1400<br>SAN JOSE, CA 95113<br>TELEPHONE NO.: (408) 287-9501 | FAX NO. (408) 287-2583 | E-MAIL ADDRESS *(Optional)*<br>ATTORNEY FOR *(Name)*:  PLAINTIFFS | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | |
|---|---|
| STREET ADDRESS: 600 EAST BROADWAY | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: GLENDALE, CA 91206-4304 | |
| BRANCH NAME: GLENDALE COURTHOUSE | |

| PLAINTIFF/PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | 20GDCV00419 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: 33004427 VXP |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☒ Summons
   b. ☒ Complaint
   c. ☒ Alternative Dispute Resolution (ADR) package
   d. ☒ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☒ other *(specify documents)*: CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE

3. a. Party served *(specify name of party as shown on documents served)*:
   **OPUS FUND SERVICES (USA) LLC, A DELAWARE LIMITED LIABILITY COMPANY**

   b. ☒ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   **MIKE CANNI - AUTHORIZED TO ACCEPT SERVICE OF PROCESS**

4. Address where the party was served: 181 SAN CREEK RD. STE F
   BRENTWOOD, CA 94513

5. I served the party *(check proper box)*
   a. ☐ by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:   (2) at *(time)*:

   b. ☒ by substituted service. On *(date)*: 05/29/2020  at *(time)*: 09:10 am  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:
   **JAMES REY - V.P. OF TECHNOLOGY**

   (1) ☒ (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   (4) ☒ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date)*:  from *(city)*:   or ☒ a declaration of mailing is attached.

   (5) ☐ I attach a declaration of diligence stating actions taken first to attempt personal service.

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 (Rev. January 1, 2007) | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, §417.10<br>POS010-1/33004427 |
|---|---|---|

| PETITIONER: ALFRED JACKSON, ET AL.<br><br>RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL. | CASE NUMBER.<br><br>20GDCV00419 |
|---|---|

c. ☐ by mail and acknowledgment of receipt of service. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                           (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ by other means *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.
    b. ☐ as the person sued under the fictitious name of *(specify):*
    c. ☐ as occupant.
    d. ☒ On behalf of *(specify):* OPUS FUND SERVICES (USA) LLC, A DELAWARE LIMITED LIABILITY COMPANY
        under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☒ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. Person who served papers
    a. Name: ALLAN MENDIETA C/O ASAP Legal, LLC
    b. Address: 255 N Market St Suite 180  San Jose, CA 95110
    c. Telephone number: (408) 564-7360
    d. The fee for service was: $ 194.00
    e. I am:

      (1) ☐ not a registered California process server.
      (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
      (3) ☒ registered California process server:
         (i) ☐ owner    ☐ employee    ☒ independent contractor.
         (ii) Registration No.: 1018
         (iii) County: SAN FRANCISCO

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
    or
9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 05/29/2020

ASAP Legal, LLC
255 N Market St Suite 180
San Jose, CA 95110
(408) 564-7360
www.ASAPLegal.com

ALLAN MENDIETA
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)                    (SIGNATURE)

| Attorney or Party without Attorney:<br>EUGENE ASHLEY, SBN: 171885<br>HOGE, FENTON, JONES & APPEL, INC.<br>60 S. MARKET STREET, SUITE 1400<br>SAN JOSE, CA 95113<br>TELEPHONE No.: (408) 287-9501     FAX No. (Optional): (408) 287-2583 | | | FOR COURT USE ONLY |
|---|---|---|---|
| Attorney for: PLAINTIFFS | E-MAIL ADDRESS (Optional): | | |
| | Ref No. or File No.:<br>33004427 VXP | | |
| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES - GLENDALE COURTHOUSE | | | |
| Plaintiff: ALFRED JACKSON, ET AL. | | | |
| Defendant: DELOITTE & TOUCHE LLP, ETC., ET AL. | | | |

| PROOF OF SERVICE<br>BY MAIL | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER:<br>20GDCV00419 |
|---|---|---|---|---|

1. I am over the age of 18 and not a party to this action. I am employed in the county where the mailing occured.

2. I served copies of the SUMMONS;COMPLAINT;ALTERNATIVE DISPUTE PACKAGE;CIVIL CASE COVER SHEET;CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE

3. By placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at SANTA ANA, California, addressed as follows:

   a. Date of Mailing:        May 29, 2020
   b. Place of Mailing:       SANTA ANA, California
   c. Addressed as follows:   OPUS FUND SERVICES (USA) LLC, A DELAWARE LIMITED LIABILITY COMPANY
                              ATTENTION: MIKE CANNI - AUTHORIZED TO ACCEPT SERVICE OF PROCESS
                              181 SAN CREEK RD. STE F
                              BRENTWOOD, CA 94513

I am readily familiar with the firm's practice for collection and processing of documents for mailing. Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid at SANTA ANA, California in the ordinary course of business.

Fee for Service: $ 194.00
ASAP Legal, LLC
255 N Market St Suite 180
San Jose, CA 95110
(408) 564-7360
www.ASAPLegal.com

I declare under penalty of perjury under the laws of the The State of California that the foregoing information contained in the return of service and statement of service fees is true and correct and that this declaration was executed on May 29, 2020.

Signature: _____
VANESSA PADILLA

**PROOF OF SERVICE BY MAIL**

Order#: 33004427/mailproof

Electronically FILED by Superior Court of California, County of Los Angeles on 06/22/2020 05:11 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Wong,Deputy Clerk
Case 2:20-cv-05774-DSF-MRW   Document 1-1   Filed 06/29/20   Page 126 of 127   Page ID POS-010
#:134

| | | FOR COURT USE ONLY |
|---|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>EUGENE ASHLEY \| SBN: 171885<br>HOGE, FENTON, JONES & APPEL, INC.<br>60 S. MARKET STREET, SUITE 1400<br>SAN JOSE, CA 95113<br>TELEPHONE NO.: (408) 287-9501 \| FAX NO. (408) 287-2583 \| E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: : PLAINTIFFS | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

STREET ADDRESS: 600 EAST BROADWAY

MAILING ADDRESS:

CITY AND ZIP CODE: GLENDALE, CA 91206-4304

BRANCH NAME: GLENDALE COURTHOUSE

| PLAINTIFF/PETITIONER: ALFRED JACKSON, ET AL. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: DELOITTE & TOUCHE LLP, ETC., ET AL | 20GDCV00419 |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: 33004657 VXP |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☒ Summons
   b. ☒ Complaint
   c. ☒ Alternative Dispute Resolution (ADR) package
   d. ☒ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☒ other *(specify documents)*: **CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT-UNLIMITED CIVIL CASE**

3. a. Party served *(specify name of party as shown on documents served)*:
   **DELOITTE TAX, LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**

   b. ☒ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   **CSC LAWYERS INCORPORATING SERVICE BY LEAVING DOCUMENTS WITH - KAILTYN MANNIX**

4. Address where the party was served: **2710 GATEWAY OAKS DR. STE 150N**
   **SACRAMENTO, CA 95833**

5. I served the party *(check proper box)*
   a. ☒ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: **06/16/2020**   (2) at *(time)*: **10:10 am**

   b. ☐ **by substituted service.** On *(date)*:  at *(time)*:  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

   *(1)* ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

   *(2)* ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   *(3)* ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   *(4)* ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
   *(date)*:  from *(city)*:                                **or** ☐ a declaration of mailing is attached.

   *(5)* ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

**POS010-1/33004657**

| PETITIONER: **ALFRED JACKSON, ET AL.** | CASE NUMBER: |
|---|---|
| RESPONDENT: **DELOITTE & TOUCHE LLP, ETC., ET AL** | **20GDCV00419** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                       (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☒ On behalf of *(specify):* **DELOITTE TAX, LLP, A DELAWARE LIMITED LIABILITY PARTNERSHIP**
    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☒ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
a. Name: **ALEJANDRO J. RUBIO C/O ASAP Legal, LLC**
b. Address: **255 N Market St Suite 180 San Jose, CA 95110**
c. Telephone number: **(408) 564-7360**
d. **The fee** for service was: **$ 194.00**
e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☒ registered California process server:
        (i) ☐ owner    ☐ employee    ☒ **independent contractor.**
        (ii) Registration No.: **2017-40**
        (iii) County: **SACRAMENTO**

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **06/18/2020**

**ASAP Legal, LLC**
**255 N Market St Suite 180**
**San Jose, CA 95110**
**(408) 564-7360**
**www.ASAPLegal.com**

| | |
|---|---|
| **ALEJANDRO J. RUBIO** | ► (SIGNATURE) |
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | |